*Decisions will be entered under Rule 50.*

ADAMS TOOLING, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68486. Filed October 21, 1959.

*James F. Thornburg, Esq., C. J. Major, Esq.,* and *John L. Carey, Esq.,* for the petitioner.

*Charles B. Norris, Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in the income tax of petitioner as follows:

| Year | Amount |
|---|---|
| 1952 | $47, 723. 95 |
| 1953 | 48, 239. 61 |
| | 95, 963. 56 |

The only issue presented is whether or not the compensation paid by petitioner to its two principal officer-shareholders exceeded a reasonable allowance for their respective services, and if so, the amount of such excess.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference. Some of the testimony and exhibits received in the case of Huckins Tool and Die, Inc. (in which case Memorandum of Findings of Fact and Opinion was filed on October 14, 1959), have been incorporated in the instant case by agreement and reference.

Adams Tooling, Inc., formerly Adams E.D.T., Inc., by a change of name only, effective October 22, 1954, was organized under the laws of the State of Indiana on May 31, 1926, with an authorized capitalization of 100 shares, common stock with a par value of $100 per share.

Petitioner filed timely Federal income tax returns for its taxable years ending December 31, 1952, and December 31, 1953, with the then director of internal revenue for the district of Indiana at Indianapolis.

The plant of petitioner in the taxable years under consideration, and its principal place of business, was located at 1702 West Washington Avenue, South Bend, Indiana.

Ownership of the issued and outstanding shares of stock as of December 31, 1952, and December 31, 1953, were as follows:

| | Number of shares | |
|---|---|---|
| | 1952 | 1953 |
| C. R. Adams | 33 | 30 |
| Lillian M. Adams | 31 | 28 |
| R. C. Adams | 33 | 33 |
| Linda E. Adams | 2 | 4 |
| Conrad R. Adams | | 2 |
| Linda Lee Adams | | 2 |

making an aggregate of 99 shares outstanding. Petitioner and all its facilities during the years in question was engaged in the business of a tool and die job shop.

During the years in question the officers of petitioner were as follows:

*1952*

Conrad R. Adams—President.
Robert C. Adams—Vice president and general manager.
Edwin B. Hampel—Vice president and works manager.
Richard Kazmierzak—Secretary-treasurer.

*1953*

Conrad R. Adams—President.
Robert C. Adams—Vice president and general manager.
Edwin B. Hampel—Vice president and works manager.
Richard Kazmierzak—Treasurer.
Fred Binder, Jr.—Secretary.

Petitioner specializes in designing and building tools for the aircraft industry and more especially in jet engine parts. These jobs are rather large in scope and rather difficult from an engineering standpoint.

A shop of this character has no fixed or standard product, and is to be distinguished from shops in which end products are manufactured and assembled. The complexities of design and fabrication were such that highly skilled labor was required and technical skill was necessary to manufacture tools and dies, where tolerances must, in some instances, be held to a range of no greater than 0.0001 of an inch.

In the course of its operation, petitioner usually received what is known as a "part print," from its customers. This part print consisted of a printed sketch or diagram of the end product which the customer wished to make. From this part print petitioner designed and built the tools or machines which made the end product. The design of petitioner's product required an imaginative effort on the part of the tool designers. When new metals were introduced by the manufacturer to be used in a product, petitioner had to design new types and methods to accommodate such new and untried metal. It was necessary for petitioner to try out these metals to find out what would happen to them under varying circumstances.

Conrad Robert Adams was the president of petitioner during the years in question and had over 50 years experience in the tool and die business, the last 30 years being with petitioner. He was born in Great Britain in 1881 and since has become an American citizen. He attended Chelsea Polytechnic in London being graduated with a degree in mechanical engineering. His career and achievements have been noted in the National Cyclopedia of American Biography, as follows:

1898–1903—Apprenticeship, R. W. Monroe Mechanical Engineers, London England.

1903–1905—Experimental Work, Keene Auto Co., London, England.

1905–1907—Tool, gauge and die maker, Pope Mfg., Pratt & Whitney of Hartford, Connecticut, and E. R. Thomas Co., Buffalo, New York.

1907—Tool Designer, Automobile Department, St. Louis Car Co., St. Louis, Missouri.

1908–1910—Charge of tool design, tool room and maintenance, Goodman Mfg. Co., Chicago, Illinois.

1911–1913—Assistant Superintendent of Assemblies, Pierce-Arrow Motor Car Co.

1914—Production Engineer, F.I.A.T. Motor Co.

1915-1916—Assistant Engineer, Chandler Motor Car Co.

1916-1926—Factory Manager, Sibley Machine and Foundry Corp., South Bend, Indiana.

1926 to Date—President and General Manager, Adams Engineering Tool & Die Co., Inc.

1944—National War Labor Board, Member of Industries.

Conrad R. Adams is an honorary life member of the Society of Mechanical Engineers. In addition to his activities in the tool and die field, he has been active in civic affairs in the community wherein he resides.

Robert C. Adams, Conrad's son, was born in 1911 and began work in the tool and die field during the summer vacations while still in high school. Upon graduation from high school, he attended Purdue University for 2 years. Before entering Purdue he had made certain special tools which permitted him to receive credit for machine shop work at the university without having to take the required course.

When Robert left Purdue in 1933, he accepted employment with Bendix Products, Corp., South Bend, as an apprentice tool- and die-maker. He completed his apprentice training after 8,000 hours of apprentice work which included approximately 800 hours on every important machine in the tool and die shop. Upon completion of the apprentice program, he worked on the bench as a journeyman for petitioner. He remained on this job for 2 years.

In 1938, Robert went on the road as a sales representative for petitioner. In 1941, he was transferred to the design room, although he also did a considerable portion of the sales work during the years in question. In the design room, he supervised an average of 10 or 12 tool and die engineers who did the designing work for petitioner.

During World War II, Robert took the job as factory manager. This included plant layout, machinery maintenance and repair, the purchase of new equipment, the purchase of supplies for the tool crib, priorities, and other associated work. He devoted most of his time to the quoting of bids and processing of work. In addition, he also worked on the budget and financing of petitioner. He has also done a considerable amount of work in the area of labor relations. This includes the negotiation of annual or biennial contracts, as well as relations at the plant level where grievances were processed and the problems of the shop committee discussed. Robert also handled customer contacts by telephone and also entertained customers.

Conrad Adams formulated the overall business and operational policies of petitioner, although both executives worked more or less as a pair or team and consulted one another on all problems.

During the years in question, Conrad and Robert devoted their time exclusively to the business of petitioner and were not employed by any other concern.

During the years under review, the plant was operating at full capacity and ran two shifts with the employees working from 55 to 65 hours per week. Robert usually worked until at least 7 o'clock in the evening 6 days a week. Conrad usually left the plant a little earlier than that.

During the years in question, approximately 90 per cent of the work brought into petitioner's shop came as a result of estimates and bids submitted by and under the direction of the executives here involved, and represented work obtained from competitive bids. In determining a bid price, an estimate was made in terms of the hours which the estimator believed would be necessary to complete the design and build the tool.

In 1951 and during the years in issue the General Electric Company of Lynn, Massachusetts, was building experimental jet aircraft engines and needed tools with which to produce the after-burner for this engine. Due to the extreme heat generated by this engine, it was necessary to develop special alloys and metals for the part exposed to such intense heat. The work characteristics of the metals used were unknown and the industry was without experience as to the type of tooling necessary to produce parts from such metals. The General Electric Company requested at least three tool and die shops to quote a fixed price to engineer and build experimental tools for this job. The tool and die shops in question were located in Buffalo, Cleveland, and Dayton. Such other tool and die shops declined to build tools for General Electric's requirements on a fixed price basis. Shortly before the period here under review, petitioner decided to undertake the job and quoted a firm price. Petitioner successfully produced the tools ordered by the General Electric Company.

General Electric subsequently established a production plant at Lockland, Ohio. This production plant was unsuccessful in contracting with a tool and die shop to build the necessary tools for the production of parts for jet engines. Upon inquiry as to where experimental tools had been built, General Electric was referred to petitioner, which contracted to produce the necessary tools. The Lockland, Ohio, plant was a relatively new plant in this work and not fully coordinated. Petitioner assisted with the engineering to the extent of establishing manufacturing tolerances. Petitioner also assisted the Lockland, Ohio, plant in the processing for the particular machine which they had available in their plant to produce the jet engines. When the plans, drawings, and specifications for the jet parts were given to petitioner, they were in the form of drawings for subassemblies of the jet engine. As a result, petitioner, during the years in question, had to design the necessary part prints so that the ultimate parts produced would fit together. It was necessary for petitioner to do the process engineering as well as the design engineering.

Petitioner was a closely owned corporation, the stock being owned by members of the Adams family. During the period here significant, Conrad R. Adams and Robert C. Adams (father and son) each owned approximately one-third of the stock and were in control of the corporation.

By the beginning of 1946, petitioner went into a period of transition from war work to civilian endeavors. Under date of January 2, 1946, it entered into employment contracts with Conrad Adams (as general manager), Robert Adams (as general sales manager), and Horace W. Wentsell (as works manager). Each contract was for a 5-year period and provided for a basic salary to each of $200 per week plus one-fifth of petitioner's net profits. Wentsell did not own any stock in the company. Wentsell's employment ceased in November of 1948. His compensation from 1946 to and including November 1948, was as follows:

| | |
|---|---|
| 1946 | $15,687 |
| 1947 | 10,480 |
| 1948 (to November) | 8,800 |

On June 2, 1947, petitioner entered into a written contract with Edwin B. Hampel as sales manager whereby petitioner agreed to pay him a weekly salary of $110 with the understanding that the employer would increase the employee's salary from time to time in such amounts as may be mutually agreed upon. As a further incentive to Hampel, petitioner agreed to pay him a bonus of 5 per cent of the net earnings of petitioner before Federal income and excess profits taxes, with the further understanding that the incentive bonus would be increased to 10 per cent of the net earnings of petitioner before taxes beginning with the earnings for the year 1952. Hampel did not own any stock in petitioner.

During the years 1946 to 1957, inclusive, petitioner's books and Federal income tax returns reflected gross sales, gross profits, net income before taxes, Federal income tax paid, compensation paid to Conrad R. and Robert C. Adams, net income after taxes, earned surplus (end of year), and net worth (end of year), as follows:

| Year | Gross sales | Gross profit | Net income before taxes | Federal income tax paid | Net income after taxes | Officers' compensation paid to C. R. Adams and R. C. Adams | Earned surplus end of year | Net worth end of year |
|---|---|---|---|---|---|---|---|---|
| 1946 | $251,637 | $62,127 | $10,619 | $2,342 | $8,277 | $31,374 | $11,637 | $66,029 |
| 1947 | 229,548 | 50,862 | 3,854 | 809 | 3,045 | 20,950 | 11,375 | 65,766 |
| 1948 | 273,684 | 61,189 | 3,692 | 775 | 2,917 | 23,400 | 13,222 | 67,613 |
| 1949 | 281,463 | 78,187 | 3,382 | 710 | 2,672 | 18,850 | 13,817 | 68,209 |
| 1950 | 612,390 | 158,682 | 29,086 | 8,241 | 20,844 | 36,000 | 31,119 | 85,511 |
| 1951 | 1,643,709 | 454,853 | 137,284 | 87,864 | 49,420 | 126,003 | 75,268 | 129,660 |
| 1952 | 1,493,908 | 490,410 | 124,196 | 81,068 | 43,128 | 128,177 | 109,318 | 163,700 |
| 1953 | 1,427,619 | 488,203 | 120,904 | 79,693 | 41,211 | 128,913 | 144,646 | 199,037 |
| 1954 | 955,435 | 322,739 | 58,162 | 24,744 | 33,418 | 80,340 | 172,205 | 226,597 |
| 1955 | 555,625 | 135,232 | (50) | 0 | (50) | 33,800 | 170,674 | 225,066 |
| 1956 | 1,024,060 | 245,480 | 45,083 | 17,738 | 27,345 | 69,866 | 192,326 | 246,717 |
| 1957 | 717,175 | 168,528 | 24,977 | 7,493 | 17,484 | 32,225 | 197,450 | 251,841 |

During the taxable years 1946 to 1957, inclusive, the compensation paid petitioner's officers was as follows:

### Conrad R. Adams, *President*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1946 | $15,687 | 0 | $15,687 | 1952 | $14,410 | $49,678 | $64,088 |
| 1947 | 10,480 | 0 | 10,480 | 1953 | 16,095 | 48,361 | 64,456 |
| 1948 | 15,900 | 0 | 15,900 | 1954 | 16,965 | 23,205 | 40,170 |
| 1949 | 9,425 | 0 | 9,425 | 1955 | 16,900 | 0 | 16,900 |
| 1950 | 10,650 | $7,350 | 18,000 | 1956 | 16,900 | 18,033 | 34,933 |
| 1951 | 13,080 | 49,921 | 63,001 | 1957 | 15,325 | 0 | 15,325 |

### Robert C. Adams, *Vice President & General Manager*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1946 | $15,687 | 0 | $15,687 | 1952 | $14,410 | $49,678 | $64,088 |
| 1947 | 10,480 | 0 | 10,480 | 1953 | 16,095 | 48,361 | 64,456 |
| 1948 | 15,900 | 0 | 15,900 | 1954 | 16,965 | 23,205 | 40,170 |
| 1949 | 9,425 | 0 | 9,425 | 1955 | 16,900 | 0 | 16,900 |
| 1950 | 11,625 | $6,375 | 18,000 | 1956 | 16,900 | 18,033 | 34,933 |
| 1951 | 13,080 | 49,921 | 63,001 | 1957 | 16,900 | 0 | 16,900 |

### Edwin B. Hampel, *Vice President & Works Manager*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1951 | $9,750 | $12,480 | $22,230 | 1955 | $13,000 | 0 | $13,000 |
| 1952 [1] | 10,600 | 24,839 | 35,439 | 1956 | 13,000 | $9,016 | 22,016 |
| 1953 [1] | 12,100 | 24,180 | 36,280 | 1957 | 13,000 | 0 | 13,000 |
| 1954 | 13,000 | 11,602 | 24,602 | | | | |

### Fred Binder, *Secretary*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1953 [1] | $8,462 | $750 | $9,212 | 1956 [2] | $9,100 | 0 | $9,100 |
| 1954 | 9,100 | 750 | 9,850 | 1957 [2] | 9,100 | 0 | 9,100 |
| 1955 [2] | 9,100 | 236 | 9,336 | | | | |

### Richard Fortenbacher, *Secretary-Treasurer*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1946 | $4,305 | 0 | $4,305 | 1948 | $5,135 | 0 | $5,135 |
| 1947 | 4,570 | 0 | 4,570 | 1949 | 1,085 | 0 | 1,085 |

### Richard Kazmierzak, *Secretary-Treasurer*

| Year | Basic | Contingent | Total | Year | Basic | Contingent | Total |
|---|---|---|---|---|---|---|---|
| 1950 | $4,421 | 0 | $4,421 | 1953 [1][3] | $6,366 | 0 | $6,366 |
| 1951 | 6,429 | 0 | 6,429 | 1954 [3] | 6,700 | 0 | 6,700 |
| 1952 [1] | 6,199 | 0 | 6,199 | | | | |

[1] Not included as officers' compensation on return, deducted elsewhere.
[2] Secretary-treasurer.
[3] Treasurer.

During the taxable years ended December 31, 1951, through December 31, 1954, petitioner had total sales and renegotiable sales as follows:

| Taxable year | Total sales | Renegotiable sales | Taxable year | Total sales | Renegotiable sales |
|---|---|---|---|---|---|
| 1951 | $1,643,709 | $1,608,000 | 1953 | $1,427,619 | $979,000 |
| 1952 | 1,493,908 | 1,219,000 | 1954 | 955,435 | 473,000 |

Petitioner's corporate books and records were examined by the Renegotiation Board of the United States and in each of the taxable

years 1951 to 1953, clearence letters were granted to the corporation.

Petitioner had the following increases in capital accounts in each of the taxable years 1950 through 1953, inclusive:

| Year | Machinery acquisition | Improve-ments to building | Total acquisition | Year | Machinery acquisition | Improve-ments to building | Total acquisition |
|------|------|------|------|------|------|------|------|
| 1950 | $19,822.86 | $1,192.87 | $21,015.73 | 1952 | $63,835.50 | $14,224.61 | $78,060.11 |
| 1951 | 41,652.02 | 27,421.90 | 69,073.92 | 1953 | 36,103.78 | | 36,103.78 |

No cash dividend was ever declared or paid by petitioner.

Petitioner had no pension plan, or definitive plantwide profit-sharing plan, or any other form of deferred compensation during the years in question.

The following table discloses the wages earned by some of the paid employees in petitioner's shop who were under the direction and control of the officers and executives of petitioner.

| Name | Year and amount | | Name | Year and amount | |
|------|------|------|------|------|------|
| | 1952 | 1953 | | 1952 | 1953 |
| R. Clark | $8,614 | $11,290 | Wm. Floyd | $9,504 | $10,848 |
| J. D. Fair | 9,432 | 12,530 | U. Ernsberger | 9,737 | 10,048 |
| R. Groppler | 9,030 | 11,647 | C. Schrader | | 10,499 |
| S. Wroblewski | 9,460 | 11,524 | J. Krislofeski | 9,475 | 10,522 |
| J. Kovach | 10,498 | 10,555 | J. Cierpial | 9,243 | |
| C. Cochran | 7,871 | 10,017 | | | |

The business activities of the tool and die industry are cyclical in nature and tend to fluctuate over the years.

Petitioner had a large volume of sales during the years 1952 and 1953. Its increase in sales and earnings was due in substantial measure to the war economy engendered by the Korean conflict. The substantial increase in production and sales added to the burdens and responsibilities of the executives, but not to an extent commensurate with the increase in production, sales, and income.

During the years in question the efficiency of petitioner's management as compared with the tool and die industry in general, was above average.

Respondent determined that the salaries paid to Conrad and Robert Adams (who were the only persons listed as officers in the income tax returns filed by petitioner) were unreasonable and excessive and disallowed the following amounts:

| Year | Amounts claimed | Amounts disallowed |
|------|------|------|
| 1952 | $128,177 | $68,177 |
| 1953 | 128,913 | 68,913 |

The effect of the foregoing was to allow deductions in the total amount of $60,000 for both executives for each of said years.

Reasonable compensation, and compensation in excess of reasonable, as to each of said executives for each of the years involved were as follows:

CONRAD R. ADAMS

| Year | Reason-able | In excess of rea-sonable |
|---|---|---|
| 1952 | $51,288 | $12,800 |
| 1953 | 51,656 | 12,800 |

ROBERT C. ADAMS

| Year | Reason-able | In excess of rea-sonable |
|---|---|---|
| 1952 | $51,288 | $12,800 |
| 1953 | 51,656 | 12,800 |

### OPINION.

Respondent allowed to petitioner corporation a total deduction of $60,000 for each of the taxable years 1952 and 1953, as compensation paid to Conrad R. Adams and Robert C. Adams, father and son, who were the chief executives of petitioner, a family-owned corporation. The same executives owned, together, approximately two-thirds of petitioner's stock, and clearly dominated the corporation. The salaries to said executives disallowed for the respective years totaled the following: 1952—$68,177; 1953—$68,913.

The problem before us is to determine what is a reasonable allowance for salary or other compensation to each of the two executives for each of the years in question under the provisions of section 23(a)(1)(A) of the Code of 1939.

The actual services performed by each of the two executives are summarized in our Findings of Fact. Suffice it to say here that each executive was thoroughly trained and experienced, possessed a high degree of intelligence and technical knowledge, worked skillfully and efficiently for long hours; rendered very valuable services to the petitioner; and was entitled to substantial compensation.

We think there is nothing to be gained by a detailed discussion of each of the contentions presented by the parties, all of which we have fully considered in conjunction with a careful examination of the entire record. We mention only one with particularity. Petitioner relies upon Regulations 118, section 39.23(a)–6(b)(3), for the proposition that since the disputed compensation was paid in accordance with written contracts, the reasonableness of the compensation in 1952 and 1953 must be determined upon the basis of the reasonableness of the agreement when entered into (1946). We think the quotation relied upon by petitioner on brief is taken somewhat out of context. We accord-

ingly set out all of the provisions of section 39.23(a)–6 (Compensation for personal services) in our footnote 1.[1]

A perusal of the provisions of the regulation seems to leave no doubt that in using the word "contract," a free bargain or arm's-length transaction was contemplated rather than, as here, one in which the contracting employees controlled the corporation. Any other view would give a closely held corporation and its controlling executives the tactical and practical opportunity from the tax perspective of adhering to and relying upon the contract as long as it might be advantageous for them to do so, or causing the execution of a new contract or arrangement if and when it better served their purposes.

On the broader horizon, it is also clear that the regulation was not designed (and could not be taken) to lessen or minimize the test supplied in the statute by the word "reasonable."

Upon the record as a whole, we have no difficulty in finding that the salary allowances determined by respondent are inadequate, but we likewise think it clear that the deductions taken by petitioner for compensation paid to the two executives for each of the years in question are in part in excess of reasonable.

---

[1] Regulations 118.

Section 39.23(a)–6 *Compensation for personal services.* (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business.

(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.

It is apparent on the record that the marked increases in sales and profits were due in substantial degree to the fortuity of Korean war conditions. The compensation of the executives was geared largely to profits and reflected in substantial measure the chance benefits of the war economy but, in our judgment, without commensurate increase in the duties and responsibilities of the executives or in the value of their services although their burdens and responsibilities no doubt became somewhat heavier.

It may be trite, but nevertheless true, in a case of this type to say that to draw the line between what is reasonable and what is excessive is a difficult undertaking. We do not think it possible in this case to draw a precise line to the dollar. We must, under the circumstances, use our judgment, after weighing all the evidence, to reconcile and integrate the elements material to our ultimate conclusions. Our Findings of Fact reflect our determinations. We implement them into this opinion by reference, since it would add nothing to repeat them here.

We need only add, for completeness, that the difference between the amount of the deduction allowed for each of the years in question is attributable to the fact that the salaries are in part based upon contingent compensation, and also to the fact that there was a small increase in basic compensation for 1953, which we see no reason to disturb. The disallowances are rounded off. No more precise answer is practicable.

*Decision will be entered under Rule 50.*