Ernest, Holdeman & Collet, Inc. v. Commissioner.
Ernest, Holdeman & Collet, Inc. v. Commissioner
Docket No. 71250.
United States Tax Court
T.C. Memo 1960-10; 1960 Tax Ct. Memo LEXIS 280; 19 T.C.M. (CCH) 42; T.C.M. (RIA) 60010; January 29, 1960
*280 Held: 1. Petitioner paid unreasonable and excessive compensation to each of its five officer-stockholders during the taxable years 1952 and 1953. Reasonable compensation is determined. 2. Petitioner correctly valued certain machines at less than cost on its closing inventories for each of the taxable years 1952, 1953, and 1954. 3. Respondent correctly added freightin to the cost of inventories for each of the taxable years 1952, 1953, and 1954. 4. Premiums paid by petitioner during 1952 and 1953 on health and accident insurance policies furnished to four of its five officers were deductible expenditures. 5. The sale of a punch press was consummated in the taxable year 1954. Accordingly, respondent correctly included petitioner's gross profit on the transaction in income for that year. Thomas H. Krise, Esq., and John H. O'Hara, Esq., for the petitioner. Bernard J. Boyle, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income and excess profits taxes for the taxable years 1952 and 1953 as follows: Year
Deficiency
1952
$255,397.28
1953
130,706.84
Several issues have been resolved by agreement of the parties. There remain for our consideration the following questions: (1) Whether salaries paid to petitioner's officers during the taxable years 1952 and 1953 were unreasonable and excessive; (2) whether petitioner correctly valued its inventory at the close of each of the taxable years 1952, 1953, and 1954; (3) whether respondent correctly added freight-in to *282 the value of inventories for each of the taxable years 1952, 1953, and 1954; (4) whether the premiums paid by petitioner during the taxable years 1952 and 1953 on health and accident insurance policies furnished to four of its five officers were deductible expenditures; and (5) whether the sale of a particular punch press was consummated in the taxable year 1954 and petitioner's gross profit on the transaction consequently includible in taxable income for that year. A net operating loss carry-back from the taxable year 1954 will be computed under Rule 50. Findings of Fact Petitioner, a corporation having its principal office in Elkhart, Indiana, was incorporated on December 29, 1947. It filed its Federal income tax returns for the taxable years 1952, 1953, and 1954 with the director of internal revenue at Indianapolis, Indiana. Petitioner succeeded the Apex Machinery Company, a partnership formed in 1946 by Frederick I., Richard W., and Robert F. Ernest, and S. Vance Holdeman, hereinafter sometimes referred to as Frederick, Richard, Robert, and Holdeman, respectively. During the years 1948 through 1950 petitioner sold new and used machine tools and did a small amount of rebuilding *283 and tooling of machine tools. In 1951, with the beginning of the Korean War, new and used machinery both became difficult to obtain, and special tooling for Foster Fastermatics (automatic, hydraulic turret lathes) and similar machines became the bulk of petitioner's business. Frederick, Richard, and Robert Ernest and S. Vance Holdeman had all worked for the manufacturer of the Foster Fastermatic. The special tooling program, which involved the engineering and service of machines for various suppliers, extended through 1952 and into 1953. Petitioner's customers included Allis-Chalmers, building jet sapphire engines; Chevrolet, building jet engines; Kaiser-Frazer and Nash-Kelvinator, building Wright engines; and Bridgeport-Lycoming and Buick, making accessories for aircraft. Petitioner retooled and reallocated Foster Fastermatics to these customers from the Government machinery pool. The machines which needed reconditioning were reworked in petitioner's plant so that they conformed to new machine tolerances. Petitioner did the engineering on the standard and special tooling but subcontracted the actual manufacture of the tools. It took the jobs on a firm bid as opposed to a cost-plus *284 basis. During the years 1948 through 1950 petitioner had an average of approximately 12 employees besides officers. The officers performed multiple functions. In 1951 the number of employees was increased to approximately 50. In 1952 the number was further increased to approximately 60. During the years 1951 through 1953 the officers worked long hours - sometimes seven days a week; the shop employees often worked 65 hours a week. Frederick I. Ernest, petitioner's president, was 59 years of age in 1952. He was educated at LaSalle Extension University and had considerable night school work in engineering, drafting, and mathematics. He started work as a machine operator for a munitions manufacturer during World War I. In 1920 he worked in the machinery division of the Elkhart Company, which manufactured automobiles. The remainder of the time between 1917 and 1942 he worked for the Foster Machine Company. He started as a machine operator, then became foreman of the turret lathe department, and was later transferred to various departments in the plant to gain wider knowledge of the business. In 1942 Frederick left the Foster Machine Company and went with C. G. Conn Band Instrument *285 Company to work on their gyroscope program. He studied the manufacturing methods at Sperry Gyroscope and then returned to Conn Company where he helped set up an assembly line for the production of such instruments. He was general manager of the machine division. Frederick later worked for the International Detrola Corporation (formerly Foster Machine Company), engaging in their various special tooling programs. He remained at that position until he and other of petitioner's officers formed the Apex Machinery Company predecessor of petitioner. He worked part time for Apex and part time for International Detrola and then eventually left International Detrola entirely. Upon the incorporation of petitioner, Frederick became its president and has continued ever since in that capacity. From 1948 until September 1951 he devoted at least two-thirds of his time to petitioner. During 1952 and 1953 he devoted full time to petitioner. His duties were diversified. During the time Frederick worked for the Foster Machine Company and its successor, the International Detrola Corporation, he developed a device known as a speed grip chuck. This mechanism is used to chuck parts while they are being *286 machined. International Detrola had no objection to his patenting the device. Petitioner itself sold some of these chucks with their special tooling. Machines were also sold through salesmen. Most of these devices were sold through manufacturers' representatives. Albert J. Collet, a graduate engineer and petitioner's vice-president until 1954, was approximately 47 years of age in 1952. Prior to his association with petitioner in 1948 he had sold used machinery and had had his own used machinery business. Collet was instrumental in obtaining new machine tool lines for petitioner. He was also an excellent salesman and set up petitioner's Indianapolis sales office. He was considered one of the better used machinery dealers. S. Vance Holdeman, petitioner's secretary, was 33 years of age in 1952. He first went to work in 1936 for the Foster Machine Company, where he remained until October 1945. During his first two years with Foster he took extension courses from Purdue University in mechanical engineering. While working for Foster he did detail engineering work, layout and design work, and later was in charge of a special machine design group. After 1945 Holdeman went to work for *287 the Indianapolis Machinery and Supply Company, the largest new and used machinery dealer in Indiana. He acted as buyer of used machinery and assisted the salesmen in the sale of new and used machinery. In 1947 he became a partner in the Apex Machinery Company, and also, for a short time, was in the wholesale plumbing business. Upon petitioner's incorporation in 1947, he became secretary of that organization. During 1952 and 1953, in addition to being officer in charge of sales, he also was officer in charge of engineering products as related to special machinery and tooling. He traveled extensively for petitioner. Holdeman has been very well accepted in his field. Richard W. Ernest, petitioner's treasurer, was 35 years of age in 1952. He had taken some night school courses in engineering, and in 1938 graduated from International Business College. Thereafter he took a sales position with a local firm. After approximately a year he left that position and took a job with the Foster Machine Company, where he worked on tooling assembly, engineering, and estimating of special equipment. In 1946 Richard left full-time employment with Foster and became a partner in the Apex Machinery Company. *288 He was occupied with the rebuilding and sale of machinery and was the first partner to devote his full time to Apex. In 1948 he became treasurer and general manager of petitioner and has since continued in that capacity. He has mechanical ability, an understanding of hydraulics, and has had experience with various lines of machine tools. He has spent considerable time estimating special machine tools. Robert F. Ernest, petitioner's assistant secretary, was 28 years of age in 1952. After graduation from high school in January 1942, he worked for the Foster Machine Company as an apprentice engineer. From February 1943 until December 1945 he served in the Army, attaining the grade of corporal. In 1950 he graduated from Indiana University, receiving a B.S. degree in business administration. During the summers, while he was in college, he worked for petitioner and its predecessor, Apex Machinery Company, in which he was a partner. In October 1950 Robert became assistant secretary of petitioner. His principal responsibility was the purchase of the special tooling to be mounted on the machines upon which petitioner was working. Petitioner engineered the special tooling but subcontracted *289 the actual manufacture of the tools. Robert was responsible for the allocation of these contracts to outside shops. It was necessary for him to co-ordinate the activities of all the shops so that the work would flow in at the proper time and meet delivery requirements. At the initial meeting of petitioner's board of directors early in 1948 the salaries of the vice-president, the treasurer, and the secretary were fixed at $5,200 per year. In addition, it was resolved that a bonus was to be paid to the officers and directors. The bonus was to equal 75 per cent of the net profits of the corporation, before provision for payment of Federal income tax, in excess of 10 per cent of the capital and surplus (including good will) of the corporation, and was to be distributed in stated proportions to the officers and directors. In August 1948 the president's salary was set at $3,400 per year. This was later decreased to $1,920 per year and then increased to $5,800 per year. At a meeting in October 1950 the board of directors voted to establish the office of assistant secretary with a salary of $3,600 per year. This salary was later increased to $4,200 and then to $4,320 per year. The *290 board of directors further resolved in December 1950 to continue the bonus plan, the only change being that the bonus was to be distributed to the officers in proportion to their basic salaries. This bonus arrangement prevailed substantially unchanged throughout the years here in issue, with the exception that the amount available to the officers was reduced as a consequence of allowing certain other employees to share in the bonus pool. Petitioner's Federal income tax returns show that the salaries paid to petitioner's officers from the time of incorporation through the taxable year 1954 were as follows: Albert J.
S. Vance
Robert F.
Frederick I.
Collet
Holdeman
Richard W.
Ernest
Ernest
Vice-
Vice-
Ernest
Asst.
Year
Total
President
President
President
Treasurer
Secretary
1948
$ 31,987.48
$ 4,791.34
$ 9,215.38
$ 8,990.38
$ 8,990.38
1949
18,200.00
3,200.00
5,000.00
5,000.00
5,000.00
1950
47,014.00
7,701.00
11,124.00
11,124.00
11,124.00
$ 5,939.00
1951
235,104.69
39,224.47
52,299.29
52,299.29
52,299.29
38,982.35
1952
402,318.19
85,162.24
85,162.24
85,162.24
85,162.24
61,669.23
1953
204,543.26
43,290.69
43,190.69
43,290.69
43,290.69
31,480.50
1954
25,882.50
5,800.00
4,162.50
5,800.00
5,800.00
4,320.00
*291 In addition to the officers' salaries deducted on its Federal income tax returns for the taxable years 1948 through 1954, petitioner also deducted the following amounts as salaries and wages not deducted elsewhere, and salaries and wages as a part of cost of goods sold: Salaries and
Salaries and
Wages (not
Wages (cost
deducted
of goods
Year
elsewhere)
sold)
1948
$ 3,184.91
$ 25,063.56
1949
7,961.18
9,899.76
1950
16,420.99
17,411.34
1951
52,707.87
120,685.46
1952
154,492.25
146,735.92
1953
234,986.24
142,524.42
1954
202,089.29
110,161.36
Petitioner paid its best salesman (not an officer) total compensation amounting to $32,624.32 in 1952 and $28,231.30 in 1953. Petitioner's officers were its stockholders as well as directors. Upon incorporation petitioner issued 400 shares of stock at a par of $100 per share, as follows: No. of
Name
shares
Frederick I. Ernest
48
Albert J. Collet
48
S. Vance Holdeman
48
Richard W. Ernest
48
Robert F. Ernest
208
From January 1, 1952, to April 1, 1954, the stock was held equally among the officers, each holding 80 shares. On April 1, 1954, Albert J. Collet sold *292 his stock to the corporation. There were no other changes in stock ownership during the years here in question. From the time of its incorporation through 1954 petitioner neither declared nor paid any dividends. Petitioner borrowed substantial sums from its officers during the years 1952 through 1954. The total amounts borrowed and the payments through January 13, 1955, were as follows: Total
Payments
Amount
Princi-
Inter-
Officer
Borrowed
pal
est
Frederick I. Ernest
$86,500
$19,000
$6,189.93
S. Vance Holdeman
94,000
59,000
4,314.24
Richard W. Ernest
98,000
35,750
6,389.90
Robert F. Ernest
97,000
54,000
4,357.53
The profit and loss statements and balance sheets on petitioner's Federal income tax returns for the taxable years 1948 through 1953 reveal the following information (all figures represent dollar amounts): 1948
1949
1950
Net sales
380,901.54
213,462.73
633,811.07
Cost of goods sold
311,413.83
167,047.36
514,554.97
Gross profit from sales
69,487.71
46,415.37
119,256.10
Other income
9,109.78
17,718.89
20,924.44
Total
78,597.49
64,134.26
140,180.54
Officers' salaries
31,987.48
18,200.00
47,014.19
Other expenses
36,924.44
44,104.71
79,919.64
Net income before Federal
income tax
9,685.57
1,829.55
13,246.71
Federal income tax
2,127.68
384.20
3,046.74
Net income to surplus
7,557.89
1,445.35
10,199.97
12/31/48
12/31/49
12/31/50
Capital
400,000.00
40,000.00
40,000.00
Paid in or capital surplus
20,000.00
Earned surplus
7,557.89
9,003.24
19,203.25
Total
47,557.89
49,003.24
79,203.25
*293 1951
1952
1953
Net sales
2,527,098.77
3,237,138.37
3,035,402.27
Cost of goods sold
1,952,586.74
2,306,348.86
2,232,514.07
Gross profit from sales
574,512.03
930,789.51
802,888.20
Other income
30,402.95
101,158.59
51,348.36
Total
604,914.98
1,031,948.10
854,236.56
Officers' salaries
235,104.69
402,318.19
204,543.26
Other expenses
286,295.61
483,017.36
563,328.29
Net income before Federal
income tax
83,514.68
146,612.55
86,365.01
Federal income tax
51,683.30
97,814.45
56,324.07
Net income to surplus
31,831.38
48,798.10
30,040.94
12/31/51
12/31/52
12/31/53
Capital
40,000.00
40,000.00
40,000.00
Paid in or capital surplus
20,000.00
20,000.00
20,000.00
Earned surplus
51,034.63
99,832.73
126,679.40
Total
111,034.63
159,832.73
186,679.40
The amounts claimed by petitioner as deductions for officers' salaries during the taxable years 1952 and 1953 and the amounts allowed and disallowed by respondent in his determination for those years are as follows: 1952
Deduction
Officer
Claimed
Allowed
Disallowed
Frederick I. Ernest
$ 85,162.24
$ 25,000.00
$ 60,162.24
Albert J. Collet
85,162.24
20,000.00
65,162.24
S. Vance Holdeman
85,162.24
25,000.00
60,162.24
Richard W. Ernest
$ 85,162.24
$ 20,000.00
$ 65,162.24
Robert F. Ernest
61,669.23
10,000.00
51,669.23
Total
$402,318.19
$100,000.00
$302,318.19
1953
Frederick I. Ernest
$ 43,290.69
$ 25,000.00
$ 18,290.69
Albert J. Collet
43,190.69
20,000.00
23,190.69
S. Vance Holdeman
43,290.69
25,000.00
18,290.69
Richard W. Ernest
43,290.69
20,000.00
23,290.69
Robert F. Ernest
31,480.50
10,000.00
21,480.50
Total
$204,543.26
$100,000.00
$104,543.26
*294 Reasonable compensation for each of the officers during the taxable years 1952 and 1953 was as follows: Officer
1952
1953
Frederick I. Ernest
$ 35,000
$ 25,000
Albert J. Collet
35,000
25,000
S. Vance Holdeman
35,000
25,000
Richard W. Ernest
35,000
25,000
Robert F. Ernest
22,000
18,000
Total
$162,000
$118,000
The used machinery market fluctuates greatly in response to supply and demand. In 1952 and the first half of 1953 the market was high because of the Korean War. With the end of that war, there was a surplus of used machinery, and the market dropped in the last half of 1953. During 1954 the Government dumped large quantities of used machinery on the market, and the market hit its low point. It was about the same in early 1955 and then began to rise in late 1955 and 1956. From January 1, 1948, through December 31, 1954, petitioner's inventories were valued at lower of cost or market. Freight-in was not added to the value of the machines for inventory purposes. It was treated as an expense. Freight-in on items in petitioner's opening inventory for January 1, 1952, totaled $5,764.85. Each year petitioner's officers reviewed the inventory, *295 item by item. In most cases they examined the machine, each giving his view regarding the market value. In arriving at a valuation they discussed the length of time the machine had been held in stock, the availability of a replacement item, and the present marketability of similar tools in their own and other dealers' inventories. Each year petitioner marked down the value of some machines from cost. In general, the factors considered in the determination of the mark-down were obsolescence, the market price of an equivalent machine, the expense involved to put the machine in saleable condition, the length of time the machine had been held in inventory, the limited work a certain machine could perform, flooding of the market by the Government, the loss by petitioner of certain lines of new machinery, the prior stripping of a machine for its parts, and error as to the condition of the machine at the time of its purchase. In the notice of deficiency respondent determined that petitioner failed to substantiate certain mark-downs from cost when valuing its inventory at lower of cost or market on December 31, 1952, December 31, 1953, and December 31, 1954. Respondent further determined *296 that freight-in should be added to the cost of inventory and not deducted as current expenses in the year paid or incurred. These adjustments totaled $6,827.17, $41,549.46, and $86,088.68 for the taxable years 1952, 1953, and 1954, respectively, computed as follows: 1952
1953
1954
Mark-downs of new and used machinery
$6,574.09
$25,104.21
$58,138.54
disallowed
Freight-in added to inventory
113.82
2,197.07
10,503.16
Mark-downs of work in process disallowed
139.26
14,248.18
17,446.98
Total
$6,827.17
$41,549.46
$86,088.68
Closing inventories, as per petitioner's books and as amended by respondent, for the years 1952, 1953, and 1954 were as follows: Inventory
Inventory
Year ended
as per peti-
as amended
December 31
tioner's books
by respondent
1952
$185,856.00
$192,683.17
1953
234,705.82
283,082.45
1954
174,857.00
309,322.31
All of the machines on which mark-downs were disallowed were in inventory as of December 31, 1954, with the exception of one, which was scrapped on that date. The bulk of the work in process constituted improvements in inventory machines made to put them in saleable condition. In *297 the notice of deficiency respondent used figures for cost and freight-in, which, in the case of several items, were in excess of those stipulated to by the parties. The excess amounts charged to cost totaled at least $5,569.76, and the excess amounts charged to freight-in totaled at least $975.66. Many of the machines purchased by petitioner during the years here involved were owned jointly with another company. Petitioner presented testimony regarding the condition and value of approximately 190 machines in inventory on December 31, 1954, and in dispute here. Subsequent to December 31, 1954, petitioner expended further amounts totaling approximately $45,672.74 on 115 of these machines. At least 70 of the above-mentioned 190 machines were sold during 1955, 48 in the first six months of that year, including 20 acquired during the last six months of 1954. Sixty-two of the machines were sold at prices substantially in excess of petitioner's valuation on December 31, 1954, plus subsequent costs and burden. Thirty-five of the machines in issue were eventually scrapped: One was scrapped on December 31, 1954, four in 1956, one in 1958, and the remainder in 1957. In the notice of deficiency *298 respondent assigned valuations to these machines totaling $13,440.29. Petitioner valued them at $1,590. Eleven of the machines were still in inventory on April 30, 1959. In the notice of deficiency respondent assigned valuations to these machines totaling $17,150.84. Petitioner valued them at $4,786.75. Petitioner's overhead on used machinery, excluding shop labor, outside work, direct materials, and commissions on sales, was approximately 20 per cent to 24 per cent for the years 1955 through 1958. Petitioner provided certain fringe benefits for its officers and other employees. During 1952, 1953, and 1954 it maintained health and accident insurance policies on four of its five officers. Frederick Ernest, petitioner's president, was not insurable and was, therefore, not furnished such a policy, nor did he receive any additional compensation in lieu thereof. Respondent disallowed deductions for premiums on these policies in the amount of $419.60 for each of the years 1952, 1953, and 1954. Early in 1954 petitioner was sales representative for the L&J Press Corporation. On May 4, 1954, the Kirsch Company gave petitioner an order for two L&J punch presses. One of the machines was *299 to be delivered August 1, 1954, and the other October 1, 1954. The first press was delivered in the latter part of 1954. The second was not shipped to the Kirsch Company until March 9, 1955. The Kirsch Company requested petitioner to invoice them for the second press in 1954, regardless of the fact that it had not then been delivered. Petitioner sent an invoice for the press to the Kirsch Company on November 23, 1954. A note at the bottom of the invoice provided as follows: As per agreement with your Mr. Corey this invoice will be honored even though the press has not been shipped to you. It will be shipped immediately upon your notification to us. The Kirsch Company paid petitioner $10,000 for the second press on December 13, 1954. Petitioner was billed $9,115.42 for the press by the L&J Press Corporation on March 9, 1955. In accord with its sales contracts for new machinery, petitioner, in 1955, paid its salesman one-half of the gross profit realized on the sale of the punch press. Opinion VAN FOSSAN, Judge: The first question is whether salaries, including bonuses, paid by petitioner to its officers during the taxable years 1952 and 1953 were reasonable or, as determined *300 by respondent, were excessive and unallowable. The question is one of fact. Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949). The burden is upon petitioner to disprove respondent's determination. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). After careful consideration of the entire record we are convinced that the petitioner paid excessive salaries to its officers during each of the taxable years 1952 and 1953. However, we are also convinced that the salary allowances determined by respondent for those years are inadequate. The record shows that petitioner's officers were all highly capable and industrious men, and that, with the exception of Robert F. Ernest, all had extensive experience in the machine tool trade. We are also aware that the machine tool industry is one which is subject to great fluctuation. Nonetheless, giving due weight to these factors, we are still unable to justify the salaries paid to petitioner's officers aggregating $402,318.19 in 1952 and $204,543.26 in 1953. The excessiveness of these salaries becomes *301 particularly apparent when considered in the light of the closely held nature of the company, its financial history, the nonpayment of dividends, and the wartime economy in existence during some of the years here in issue. Petitioner's stock was owned equally by its five officers during 1952 and 1953. Each officer held 80 of the 400 shares outstanding. The compensation received by the officers clearly reflected their equal ownership. The president, vice-president, secretary, and treasurer each drew a fixed salary of $5,800 during the years here in issue. Robert F. Ernest, the assistant secretary, drew a fixed salary of $4,200 in 1952 and $4,320 in 1953. In addition to these fixed salaries, each of the officers shared in a bonus pool in direct proportion to his basic salary. As a consequence of this arrangement, each of the officers, with the exception of Robert F. Ernest, drew total compensation of $85,162.24 in 1952 and approximately $43,290.69 in 1953. [1] Robert drew a total salary of $61,669.23 in 1952 and $31,480.50 in 1953. The deviation from equal distribution shown in the salary paid Robert was apparently determined by his youth and lack of experience. *302 Robert was 28 years of age in 1952. He had been awarded a bachelor's degree in business administration by Indiana University in 1950. His practical experience before joining petitioner full time in 1950 consisted of approximately a year with the Foster Machine Company as an apprentice engineer, nearly three years in the United States Army, where he attained the grade of corporal, and four summers with petitioner and its predecessor. Considering his age and background, we think it reasonable to conclude that no business organization bargaining at arm's length would have paid him a salary of such magnitude as that paid by petitioner. Significantly, petitioner neither declared nor paid any dividends from the time of its incorporation through the taxable year 1954. Cf. Long Island Drug Co., 35 B.T.A. 328 (1937), affd. 111 F. 2d 593 (C.A. 2, 1940). Petitioner urges that it was newly formed, expanding rapidly, and in no financial position to pay dividends during the years here in issue. In support of this contention petitioner notes that it was necessary for it to borrow substantial sums from its officers. We suggest that the necessity for borrowing from *303 the officers is, in itself, an indication that the salaries paid the officers were excessive. If the salaries had been more reasonable, the necessity for borrowing might not have arisen. By paying large salaries and then borrowing back, petitioner would realize not only an initial deduction for the salaries paid but also an additional deduction for interest paid on the loans. None of petitioner's officers received a salary in excess of $7,000 prior to becoming associated with petitioner or its predecessor. The remarkable increase in sales and profits enjoyed by petitioner during 1952 and 1953 was not due solely to normal application of the officers' skill and business acumen; rather, it was due in great measure to the Korean War effort and consequent need for retooling in some industries. The large salaries received by petitioner's officers during those years cannot therefore be attributed entirely to their sagacity and industry but resulted, at least in part, from abnormal wartime conditions. Cf. Locke Mach. Co. v. Commissioner, 168 F. 2d 21 (C.A. 6, 1948); Adams Tooling, Inc., 33 T.C. 65 (Oct. 21, 1959). Reasonable compensation for each of petitioner's *304 officers for the years 1952 and 1953 is set forth in our findings of fact. There are two questions concerning respondent's treatment of petitioner's inventory for the taxable years 1952, 1953, and 1954: First, whether respondent correctly restored to cost the value of certain machines marked down by petitioner, and second, whether respondent correctly added freight-in to inventory. During the years here in issue petitioner valued its inventory at lower of cost or market. Each year the machines in inventory were carefully evaluated by petitioner's officers. In many instances the inventory valuation of a machine was reduced from cost to existing market value. Some of the machines were marked down to scrap value. In certain instances wherein petitioner had renovated or otherwise performed work on a machine, the valuation of the work performed was substantially reduced. Freight-in was treated as an expense. Respondent determined that petitioner had failed to substantiate inventory mark-downs on new and used machinery and on work in process in the approximate amounts of $6,713.35, $39,352.39, and $75,585.52 for the taxable years ending December 31, 1952, 1953, and 1954, respectively. *305 Respondent further determined that freight-in in the amounts of $113.82, $2,197.07, and $10,503.16 should be added to inventory for the respective years involved. All the mark-downs disallowed by respondent pertained to machines in inventory on December 31, 1954. Each year petitioner's officers, men with extensive experience in the machine tool business, carefully reviewed petitioner's inventory, item by item. In most cases they physically inspected the machine to be evaluated, each man giving his view as to its current market value. In arriving at a valuation they considered such factors as the length of time the machine had been in inventory, the market price of an equivalent machine, availability of a replacement item, the expense involved to put a machine in saleable condition, limitations on the type of work a machine could perform, the flooding of the machine tool market by the Government, prior stripping of a machine for its parts, loss of a line of new machinery, and error as to the condition of a machine at the time of purchase. At the trial Richard W. Ernest testified in detail concerning the condition, market value, and reason for the mark-down in valuation of 190 separate *306 machines here in issue. The valuation assigned by petitioner to the various machines was fully corroborated by an expert witness with many years' experience in the sale of machine tools. Respondent produced no evidence or testimony contradictory to the valuation assigned the machines by petitioner. In the light of the above facts we hold that petitioner has carried its burden and that the valuations assigned to the machines by petitioner should be sustained. Justus & Parker Co., 13 B.T.A. 127 (1928). It is not of controlling importance that many of the machines were subsequently sold at prices substantially in excess of petitioner's valuation on December 31, 1954, plus subsequent costs. The market for used machinery fluctuates greatly in response to supply and demand. Respondent points out that section 39.22(c)-2(f)(2) of Regulations 118 and section 1,471-2(f)(2), Income Tax Regs., both state that taking work in process at a nominal price for inventory purposes is improper. Of the total amounts added back to inventory by respondent, $139.26, $14,248.18, and $17,446.98 represent the value of work in process marked down by petitioner during 1952, 1953, and 1954, *307 respectively. Petitioner's work in process consisted of labor and materials expended in the reconditioning and alteration of machines held in inventory. Of necessity the value of these improvements was inextricably intertwined with the value of, and demand for, the basic machine. It can readily be seen that petitioner's work in process was so different from the usual concept of that term that stringent application of the Regulation forbidding reduction of work in process to a nominal value would, in this case, be contrary to the spirit and intent of the revenue laws. When the market value of a machine in petitioner's inventory declined, it was but prudent accounting, commensurate with the lower of cost or market method of valuing inventory, to reduce the value of labor and materials invested in the renovation or alteration of that machine. Thirty-five of the machines here in issue were eventually scrapped. Some were carried at scrap value on December 31, 1954. With the exception of one machine scrapped on December 31, 1954, all were scrapped in years subsequent to 1954, the majority being disposed of in 1957. Respondent asserts that these machines should be carried in inventory *308 at cost until actually scrapped, citing National Fireworks v. Commissioner, 243 F. 2d 295 (C.A. 1, 1957), affirming a Memorandum Opinion of this Court [15 TCM 1; T.C. Memo. 1956-1]. Respondent's reliance on National Fireworks, supra, is misplaced. There, this Court first held that the taxpayer was to be regarded as having valued its inventory at cost; the Court then logically held that inventory items which were scrapped should be valued at cost until actually scrapped and the loss taken at that time. Here, the situation is entirely different. Respondent does not dispute that petitioner valued its inventory at lower of cost or market. As above stated, it was petitioner's policy to review its inventory each year. When it became apparent that the going market value of a particular machine was less than petitioner's cost basis, the inventory valuation was reduced to accord with market. In some instances it was the opinion of petitioner's officers that a machine had only scrap value. In such case the machine was marked down to that valuation. This procedure properly resulted in the realization of a loss when it occurred - the *309 year the machine became worthless, not necessarily the year the machine was physically cast upon the scrap pile. Accord, C-O-Two Fire Equipment Co. v. Commissioner, 219 F. 2d 57 (C.A. 3, 1955), reversing 22 T.C. 124; American Manganese Steel Co., 7 B.T.A. 659 (1927). It was petitioner's practice to treat freight-in as an expense. Respondent added freight-in to inventory for each of the years here in issue. Section 22(c) of the Internal Revenue Code of 1939 and section 471 of the Internal Revenue Code of 1954 both provide that whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine income, they shall be taken upon such basis as the Commissioner may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. Respondent's Regulations have consistently provided that cost includes transportation or other necessary charges incurred in acquiring possession of the goods. Sec. 19.22(c)-3(2) of *310 Regulations 103, sec. 29.22(c)-3(2) of Regulations 111, sec. 39.22(c)-3(b) of Regulations 118, and sec. 1.471-3(b) of the Income Tax Regs. Such procedure is in accord with better accounting principles. May, Stern & Co., 20 B.T.A. 241 (1930), affd. 56 F. 2d 1034 (C.A. 3, 1931). Accordingly, we affirm respondent's action in adding freight-in to inventory for the years here in issue. On brief petitioner urges that respondent erred in adding freight-in to closing inventory for the taxable year 1952 without making a similar adjustment in opening inventory for that year. No mention is made of opening inventory for 1952 in the petition. Even were we to assume that petitioner, by pleading error in the closing inventory for 1952, had indirectly put in issue the proper treatment of opening inventory for that year, we could still not regard respondent's action as in error. The addition of freight-in to opening inventory for 1952 would, in effect, allow petitioner a double deduction for transportation charges on items in inventory on January 1, 1952. Since it was petitioner's policy to treat freight-in as an expense, the cost of acquiring *311 these inventory items was presumably deducted by petitioner in prior years. The inclusion of these charges in opening inventory for 1952 would increase the cost of goods sold for that year and, in net result, afford petitioner a second deduction for these same costs. Petitioner maintained health and accident insurance policies on all its officers other than Frederick Ernest, who was uninsurable. Respondent disallowed deductions for premiums on these policies in the amount of $419.60 for each of the years 1952, 1953, and 1954. On brief respondent concedes the issue as to 1954 but argues that the premiums paid in 1952 and 1953 constituted a portion of the unreasonable and excessive compensation paid to the officers during those years. It is not unusual for a corporation to provide such insurance. The amounts paid were neither unreasonable nor excessive. Frederick Ernest, who was not insured, received no compensation in lieu thereof. The payments cannot, therefore, be regarded as dividends. We conclude that respondent erred and that the payments were deductible in each of the years here in issue. On approximately May 4, 1954, petitioner, sales representative for the L&J Press Corporation, *312 received an order for two L&J punch presses. Both machines were to be delivered in 1954. The first press was delivered in the latter part of 1954; the second was not shipped by the manufacturer to the purchaser until March 9, 1955. Even though the second press was not shipped until 1955, petitioner, at the purchaser's request, sent an invoice covering the press on November 23, 1954. A note at the bottom of the invoice stated that as per their agreement the invoice would be honored even though the press had not been shipped. The note further provided that the press would be shipped immediately upon purchaser's notification to petitioner. Petitioner received full payment for the press on December 13, 1954. Respondent determined that the sale of the press was made in the taxable year 1954 and that $884.58 (petitioner's gross profit on the transaction) should be included in income for that year. Petitioner contends that the sale was not consummated until 1955 and was correctly reported in that year. Respondent's determination must be sustained. The machine was ordered and, in accord with the purchaser's wishes, fully paid for before the close of the taxable year 1954. By the terms *313 of the contract it was to have been delivered October 1, 1954. It is reasonable to infer from the note on the invoice that delivery was delayed at the purchaser's request. It is obvious that the parties intended that a sale take place before the close of the taxable year 1954 and that the sale, in fact, did then take place. Actual delivery is not always necessary to effect a transfer of personalty. A. W. Mellon, 36 B.T.A. 977, at 1065. Cf. Florence G. Baldwin, 23 B.T.A. 512 (1931); Edwin M. Brown, 1 B.T.A. 502 (1925). Decision will be entered under Rule 50. Footnotes
1. Albert J. Collet drew $43,190.69 in 1953.↩