Harolds Club v. Commissioner.
Harolds Club v. Commissioner
Docket No. 93450.
United States Tax Court
T.C. Memo 1963-198; 1963 Tax Ct. Memo LEXIS 142; 22 T.C.M. (CCH) 969; T.C.M. (RIA) 63198; July 29, 1963
*142 Held, a portion of the amounts paid during the years 1952 to 1956, inclusive, by petitioner to its general manager, who was the father of petitioner's controlling shareholders, represented unreasonable compensation. Valentine Brooks, 1720 Mills Tower, San Francisco, Calif. and John S. Halley, for the petitioner. Leon Yudkin, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income tax and/or excess profits tax for the taxable years 1952 to 1956, inclusive, in the amounts of $212,744.85, $397,593.46, $200,779.05, $182,611.32 and $221,204.38, respectively. [1] The only issue [2] for decision *143 in this proceeding is whether the amounts paid by the petitioner to Raymond I. Smith, its general manager, during the years 1952 to 1956, inclusive, constituted reasonable compensation within the meaning of section 162(a)(1) of the Internal Revenue Code of 1954 and section 23(a)(1)(A) of the Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a Nevada corporation, was incorporated on December 27, 1946. Petitioner filed its corporate income tax returns for the taxable years 1952 to 1956, inclusive, with the district director of internal revenue at Reno, Nevada. In 1934 Raymond I. Smith, hereinafter referred to as Smith, operated a gaming concession in Modesto, California. The business was closed down *144 by the local district attorney, and Smith decided to relocate the family gaming operations in an area where gambling was legal. In January 1935, Smith and his son Harold, who was at that time 25 years of age, travelled to Reno, Nevada, to investigate the possibility of establishing a gaming business in that area. A building, hereinafter referred to as the St. Charles Building, located at 236 North Virginia Street in Reno, was selected and Harold executed a lease for the premises. After the lease was signed, Harold remained in Reno to set up the business and Smith returned to California. Smith, Harold, and Raymond, Smith's other son, each put up funds to get the Reno operation started. Smith advanced approximately $2,000 which was repaid to him about 18 months later. The business was operated as a sole proprietorship with Harold as owner and was known as Harolds Club. On numerous occasions previous to 1935 Harold had worked for Smith in the latter's gaming operations which had been established from time to time by Smith in various parts of the country. Shortly after the Reno operation was begun, Smith sent Harold to Rio Nido, California, to operate a bingo game. Harold had been *145 dominated by Smith most of his life and usually acquiesced when Smith sent him to work in one of his gaming locations. While Harold was in Rio Nido, the management of the Reno operation was taken over by Raymond, who at that time was 27 years of age. Because the Reno business was "going dead," it was decided that Smith should come to Reno and take over the management of Harolds Club. In July 1935 Smith left California and became the general manager of the club. As general manager Smith was responsible for supervising the over-all gaming operations, for hiring and firing of all employees, and for handling the advertising, promotional and public relations aspects of the business. In addition, during the early years Smith also maintained the club's books. Beginning in 1941 the club was open 24 hours a day. During the years 1941 to 1951, Smith worked on the average about 12 to 14 hours a day, 7 days a week During the years 1952 to 1956, Smith spent about 12 hours a day on the club's premises. Even when he was not on duty, Smith was subject to call at any time, day or night. After Smith took over as the general manager, Raymond, and Harold, who returned from California in September *146 1935, became dealers. When Harolds Club began to expand, Harold and Raymond became floor managers, working separate shifts. Their duties as floor managers involved principally the servicing of tables to provide necessary cash and the policing of the premises to prevent cheating by customers and employees. In their capacities, first as dealers, then as floor managers, Harold and Raymond were under the control of Smith. In 1938 Smith suggested that Harold give a one-third interest in the club to Raymond. Harold agreed and on July 1, 1938, Raymond and Harold executed a partnership agreement whereby Harold was designated as a two-thirds owner of the club and Raymond was designated as a one-third owner of said club. In the beginning, Smith was paid a salary, plus a bonus which was determined at the end of the year. Sometime in the early part of 1941 Smith and his two sons discussed the idea of paying Smith a fixed percentage of yearly profits instead of having to discuss the question of his bonus at the end of each year. Smith suggested that he be paid 20 percent of the profits. Percentage employment contracts were not uncommon in the gaming business. Since Smith was running the club *147 at this time and was the "brains" of the organization, his sons had no objection. As a result, a contract was executed on January 15, 1941, by Smith and his two sons which provided, in pertinent part, that the partnership known as "Harold's Club" agrees to employ Smith, so long as his services are satisfactory as General Manager of Harolds Club, at a salary of Ten Thousand ($10,000) Dollars per year, and Twenty (20%) per cent of the yearly net profits accruing by reason of the operation of said Club. At the time the employment contract was entered into, Smith was the dominant factor in the management of Harolds Club and was in charge of making the club's policy. Harolds Club, under the managership of Smith, prospered and became one of the largest gaming operations in Nevada. The tremendous success of the club was due to a large extent to various promotional and operational devices conceived by Smith and adapted to the business of the club. Among these devices were the use of extensive advertising, particularly road signs which were located throughout the United States; the use of women dealers; the introduction of a more liberal slot machine payout policy; the inculcation of *148 a friendly atmosphere, an unknown commodity in most gaming houses; the making of substantial contributions to local charitable and educational institutions; the use of catwalks to curtail cheating by customers and employees; and the practice of doubling the customers' bets at unspecified times throughout the day. All of the aforementioned devices were conceived by Smith prior to 1952. Smith's innovations or devices were so successful that it was not long before most, if not all, of them were being employed to some degree by other gaming houses in Nevada. Because of the success of these innovations or devices and their widespread adoption by other gaming casinos, Smith was frequently referred to as a "Wizard of Promotion" and the "Granddaddy of Gambling" in Nevada. Prior to 1942 Harolds Club had no bar or restaurant facilities available to its customers. It became apparent to Smith that many customers who desired something to drink would leave the club premises in search of such refreshments and that once they had left the club they would seldom return. In order to keep the customers on the premises, Smith suggested to Harold and Raymond that Harolds Club install a bar. The sons *149 at first opposed the idea, but eventually Smith prevailed. The bar became the personal operation of Smith and all profits derived therefrom were his. Smith paid no rent to Harolds Club for the space which the bar occupied. By 1956 Smith had installed 7 bars in the club. Sometime after 1942, the ownership of the bars was transferred to Smith's whollyowned corporation, Raymond I. Smith, Inc. While the bars helped increase to some extent the business of Harolds Club, as the club's business grew the business and the profits of the bars also increased. In 1940 Smith purchased the St. Charles Building and in 1942 transferred the building to Harold. Because Harold was drinking and gambling quite heavily, Smith sometime after the aforegoing transfer became alarmed that Harold might "lose the whole club." In the early part of 1943 Smith went to Harold and strongly "advised" the latter to transfer the St. Charles Building to Raymond. Harold complied with his father's suggestion. In 1947 Raymond transferred the building to his wholly-owned corporation, the St. Charles Building Corporation. In 1944 Smith acquired the lease to property adjacent to the St. Charles Building known as the Chase *150 Building, and thereafter sublet the premises to Harolds Club on a year-to-year basis. Smith subsequently transferred the prime lease to his corporation, Raymond I. Smith, Inc. During the years 1952 to 1956, inclusive, Harolds Club paid an annual rental of $60,000 to Raymond I. Smith, Inc. The prime lease will expire in 1978. On December 31, 1946, Harolds Club, a partnership, was transferred in its entirety to petitioner in exchange for all of the latter's stock and notes. Both stock and notes were issued in the proportion of two-thirds to Harold and one-third to Raymond. On the same day the petitioner entered into an agreement with Smith continuing his employment under substantially the same terms and conditions that existed prior to the incorporation of Harolds Club. At about the time petitioner was incorporated, Harold was experiencing marital difficulties and a divorce appeared to be imminent. Smith consulted his attorney and they decided that Smith should have some protection, that is, an interest in the management of petitioner, in case Harold's wife made certain demands. On January 2, 1947, a voting trust agreement was entered into for a term of 6 years, pursuant to which *151 all of the petitioner's stock was placed in the voting trust. The voting trustees were Smith, Harold and Raymond. Under the terms of the trust agreement, a majority vote was to decide all issues. The voting trust agreement expired under its terms on January 2, 1953, and was not renewed. On January 22, 1947, Harold was divorced by his wife. Pursuant to a property settlement agreement entered into incident to the divorce, Harold's wife became the owner of one-half of the stock theretofore listed as owned by Harold. Harold's wife did not receive a stock certificate evidencing her stock ownership until the voting trust agreement terminated in 1953. In February 1941 petitioner purchased a property adjacent to the Chase Building. The petitioner did not take possession of the property until 1953. Within a short time after gaming operations were extended into this building, Smith recommended that the building be torn down and new structure erected. Although Harold was against the plan, Raymond agreed with Smith and it was decided to demolish the old building and erect a seven-story building. Construction was commenced in late 1953 and was completed by 1955. By 1952 petitioner was employing *152 approximately 800 people and had undergone certain organizational changes. Harold was now an assistant manager and Raymond was shifted to the bookkeeping department. In addition, a business manager and a casino manager were hired. The business manager was in charge of the bookkeeping and clerical departments and the petitioner's outside business. The casino manager was in charge of the dealers, customer credit checkers, the maintenance department, and the assistant floor managers. The business manager and casino manager reported directly to Smith. During the years between 1941 and 1956 the question of expanding the operations of petitioner to other areas arose on several occasions. On one occasion Smith wanted to acquire the Riverside Hotel, but Harold and Raymond voted against the acquisition. Sometime later Smith thought it would be a good idea to acquire property on the north side of Lake Tahoe. Again Harold and Raymond disagreed and no further action was taken. Sometime prior to 1956 Harold suggested that the petitioner acquire property on the south side of Lake Tahoe. This time Smith and Raymond joined together and voted against such a move. As a result, no action was taken *153 by petitioner. On November 15, 1946, a corporation known as Raymond I. Smith, Inc., hereinafter referred to as Smith, Inc., was incorporated. Smith was the sole shareholder of Smith, Inc. and its president and secretary. During the years 1952 to 1956, inclusive, Smith, Inc., owned various items of property used in connection with the operation of petitioner, including the Chase lease, the bars, an antique gun collection originally acquired by Smith which was leased to petitioner at an annual rental of $19,000, and several motels which were used to accommodate the customers of petitioner. Smith, Inc., acquired some of its properties with money borrowed from petitioner. In 1949 Smith, Inc., acquired a first refusal option from Harold, entitling it to buy Harold's stock in petitioner for $500,000 should Harold offer it for sale during the succeeding 5 years. During the years 1952 to 1956, inclusive, the net income of Smith, Inc., was $160,671.69, $224,253.89, $220,371.08, $278,630.70 and $285,244.22, respectively. Although Smith was the general officer of his corporation and performed duties in connection therewith, he received no salary. In 1956 a contract for the sale to third parties *154 of the outstanding stocks of petitioner, St. Charles Building Corporation and Smith, Inc., was executed. The total sales price was $9,500,000. Included in the contract of sale was an agreement to the effect that the purchaser would enter into a contract with Smith whereby the latter would render services to the purchaser in an executive capacity for a period of one year for a consideration of $100,000. It was understood by the parties that Smith, following the sale, was merely to serve in an advisory capacity and to train the new managers. Furthermore, Smith was not expected to work as many hours as he had worked previously. The buyer subsequently defaulted and the buyer's forfeited deposit of $300,000 was divided among Smith, Harold, Raymond and Harold's former wife, Dorothy. In 1962 petitioner was sold to outsiders. The net income of Harolds Club, the partnership, after the payments to Smith and the amounts paid to Smith during the years 1938 to 1946, inclusive, were as follows: Amounts Paid
Net Income
to Smith
1938
$ 19,564.21
$ 10,000.00
1939
42,471.67
13,000.00
1940
69,834.37
35,000.00
1941
156,977.88
44,313.83
1942
515,198.61
133,599.09
1943
861,878.26
208,471.52
1944
1,019,163.96
251,700.56
1945
1,652,113.17
379,716.63
1946
1,756,471.38
387,769.90
*155 The net income of petitioner before income taxes but after the deduction of payments to Smith and petitioner's other officers; and the amounts paid to Smith, Harold and Raymond during the years 1947 to 1956, inclusive, were as follows: Amounts Paid
Amounts Paid
Amounts Paid
Net Income
to Smith
to Harold
to Raymond
1947
$1,373,224.16
$378,306.04
$50,000.00
$50,000.00
1948
1,318,778.09
393,708.23
80,000.00
65,000.00
1949
1,006,629.23
284,122.84
50,000.00
50,000.00
1950
1,216,373.65
346,593.41
65,000.00
65,000.00
1951
2,018,070.93
514,517.73
70,000.00
70,000.00
1952
1,367,029.88
350,201.20
60,000.00
60,000.00
1953
2,098,906.01
557,559.57
65,000.00
65,000.00
1954
1,832,078.30
486,113.56
65,000.00
65,000.00
1955
1,660,115.87
451,175.62
75,000.00
75,000.00
1956
1,982,532.57
525,393.04
75,000.00
75,000.00
The amounts paid to Smith in the years 1952 to 1956, inclusive, were in excess of amounts paid to employees of other gaming casinos who performed duties similar in many respects to those performed by Smith. For the years 1952 to 1956, inclusive, the respondent disallowed as a deduction from petitioner's *156 annual income amounts paid to Smith in excess of $100,000 per year. Opinion Section 162(a)(1) of the Internal Revenue Code of 1954 provides as follows: (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered. Petitioner claims the right under this section and under section 23(a)(1)(A) of the Internal Revenue Code of 1939[3] to deduct the amounts paid to Smith during each of the years 1952 to 1956, inclusive. Respondent determined that the amounts paid by petitioner to Smith in each of these years in excess of $100,000 constituted unreasonable compensation and accordingly respondent disallowed said amounts as deductions. The question therefore to be *157 determined by this Court, as previously stated, is whether the amounts paid by petitioner to Smith during the years 1952 to 1956, inclusive, represented a reasonable allowance for the personal services of Smith. It is well settled that the question of what constitutes reasonable compensation is essentially a question of fact to be determined by the peculiar facts and circumstances in each particular case. Miller Mfg. Co. v. Commissioner, 149 F. 2d 421, 422 (C.A. 4, 1945), affirming a Memorandum Opinion of this Court; Hoffman Radio Corp. v. Commissioner, 177 F. 2d 264 (C.A. 9, 1949), affirming a Memorandum Opinion of this Court; and Conn. Marine Boiler Works v. Sec'y Maritime Comm., 16 T.C. 339 (1951). Petitioner relies in principal part upon Income Tax Regulations § 1.162-7[4] and urges that since the disputed compensation was paid pursuant to "a free bargain between the employer and the individual," the reasonableness of the compensation during the years in issue must be determined upon the basis of facts existing at *158 the time said contract was entered into and not upon the basis of facts existing at the time the compensation was actually paid. *159 In view of the family relationship existing between Harold and Raymond, the employers, and Smith, the employee; the ages and experience of the employers; Smith's domination over his sons in the past; the respective roles and duties of the sons and Smith in Harolds Club's creation and organization; and the reasons offered by Harold and Raymond for agreeing to Smith's "suggested" compensation, we cannot say that petitioner has established that the original employment contract (1941) between Harolds Club and Smith was the product of a free bargain or arm's-length transaction. Such being the case, the petitioner's contention that the reasonableness of the compensation is to be judged solely on the basis of circumstances existing at the time the contract was entered into is rejected. See and compare Hoffman Radio Corp. v. Commissioner, supra; Conn. Marine Boiler Works v. Sec'y Maritime Comm., supra; Adams Tooling, Inc., 33 T.C. 65 (1959), affd. 289 F. 2d 554 (C.A. 7, 1961). After carefully reviewing "all the circumstances" in this case, we are of the opinion that a portion of the amounts paid to Smith in each of the taxable years *160 was in excess of a reasonable compensation. It is evident that Smith, by reason of his personality, ingenuity, foresight and diligence, played a major role in the development and success of the petitioner. He devoted most of his time to the business and his promotional and operating innovations gained him widespread fame as a promoter and businessman. In addition, the employment contract of 1956 between Smith and the prospective purchaser of petitioner cannot be ignored, and weight must be given to the fact that Smith was to be paid $100,000 a year for merely serving in an advisory capacity and and training new managers. Finally, it must be noted that Harold and Raymond, while performing fewer duties and serving in far lesser capacities than Smith, each received during the taxable years a yearly salary of $60,000 to $75,000. [5] All of these facts are important and have been given full weight. However, they are not conclusive. We must also give weight to the fact that during the taxable years Smith worked shorter hours and had less work to do; that most of the significant innovations by Smith had been installed or utilized prior to 1952; that Smith's salary during each of the taxable *161 years was in excess of salaries paid to executives of other gaming casinos; and that Smith during the taxable years received no salary from Smith, Inc., a corporation in which he was the president and sole shareholder, even though the corporation had a substantial net income in each year. Of additional importance is the fact that Smith, while owning no stock in petitioner, was at all times in a position to exert considerable influence on the policies and operations of petitioner. Evidence of such influence may be found in the fact that Smith had an equal vote with the shareholders not only during the existence of the voting trust agreement but during the period subsequent to its termination, that the voting trust agreement was executed to give Smith protection although he was supposedly only an employee, that Smith's wholly-owned corporation was the owner of the bars located on petitioner's premises and that Smith's wholly-owned corporation controlled the lease to property on which an integral part of petitioner's establishment was located. *162 It is these factors which have led us to the conclusion that a portion of the amounts paid to Smith represented unreasonable compensation. Several gaming casino executives testified that in their opinion the amounts paid to Smith were reasonable. However, the witnesses admitted that their opinions were not based upon salaries paid to others in the industry and we learned of no instance where salaries of other gaming casino executives reached the sums paid in this case. In cases such as this it is difficult to say what is reasonable and what is excessive. After weighing all the evidence and using our best judgment, we have come to the conclusion that a salary in each of the taxable years in issue of $10,000 plus 15 percent of the net income, [6] as defined by the employment contract of 1946, represents a reasonable compensation Decision will be entered under Rule 50. Footnotes
1. The statutory notice of deficiency in this case included a deficiency in the amount of $355,534 for the taxable year 1951. The petitioner paid said amount and filed suit for refund in the United States District Court for the District of Nevada. ↩
2. Numerous other adjustments contained in the statutory notice were conceded by the petitioner prior to the filing of the petition.↩
3. Sec. 23(a)(1)(A), I.R.C. 1939, applicable to the years 1952 and 1953, contains language similar to that which appears in sec. 162(a)(1), I.R.C. 1954↩.
4. § 1.162-7 Compensation for personal services. (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. (b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: * * *
(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.↩
5. Respondent's allowance of these amounts as deductions is to be compared with the respondent's assertion that amounts paid to Smith, petitioner's general manager, in excess of $100,000 were unreasonable.↩
6. During the taxable years petitioner claimed a deduction for amounts paid to Smith computed on the basis of a salary of $10,000 plus 20 percent of the net income, as defined by the employment contract of 1946.↩