WILLIAM C. AND BETTY L. NEILS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Neils v. Commissioner
Docket Nos. 5801-79, 5802-79, 17552-79.
United States Tax Court
T.C. Memo 1982-173; 1982 Tax Ct. Memo LEXIS 574; 43 T.C.M. (CCH) 982; T.C.M. (RIA) 82173; April 6, 1982. James Powers, for the petitioners. Brad S. Ostroff, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge:* Respondent determined deficiencies as follows: Petitioner(s)
Docket No.
Year
Deficiency
William C. and
5801-79
1974
$ 6,771.00
Betty L. Neils
1975
3,830.00
Neils Detroit
5802-79
1974
41,135.52
Diesel, Inc.
1975
62,401.44
Neils Detroit
17552-79
1976
57,272.00
Diesel, Inc.
1977
38,348.00
*575 The sole issue for decision is whether the salary and bonus paid by Neils Detroit Diesel, Inc., to its president, William C. Neils, constituted reasonable compensation deductible as a business expense under section 162(a). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. [3] Other facts result from both documentary and testimonial evidence. The Court finds the following facts: *576 Willian C. Neils ("petitioner") and Betty L. Neils [4], husband and wife, resided in Phoenix, Arizona, when they filed their petition in this case. At the time of the filing of its petitions, Neils Detroit Diesel, Inc. (the "Corporation"), was a corporation with its principal place of business in Phoenix, Arizona. Petitioner William C. Neils attended high school and two and one half years of college in Great Falls, Montana. Beginning in high school and continuing to the present time, petitioner worked continuously in the field of heavy construction equipment and supplies. Petitioner first worked as a timekeeper for a Caterpillar Tractor Company ("Caterpillar") [5] dealer [6] in Great Falls. Subsequently, he moved from his timekeeping position into the shop where he worked as an apprentice mechanic for several years. He then worked through most phases of the parts department, worked a short period as a sales engineer, and finally, at about the age of 20, he became the manager of a new branch opened in Lewistown, Montana. The Lewistown branch was responsible for selling, servicing *577 and supplying parts for Caterpillar products in the surrounding area. Petitioner left his position in Lewistown when called to active duty by the Army. As a master sergeant, petitioner was in charge of maintenance and operation of the heavy equipment section of the Second Combat Engineer Group in Korea. Petitioner supervised the construction of such projects as pontoon bridges, emergency air strips, and infantry bunkers. In December 1952, petitioner returned to Montana and went back to work for the Caterpillar dealer in Great Falls. In mid-1953 petitioner started his own appliance business which failed approximately nine months later. Petitioner was subsequently employed by the Great Falls Terex [7] dealer, where his responsibilities were primarily in sales. In 1959, petitioner left this position and, together with two others, opened a construction equipment *578 and supply company under the name Monte Machinery GM Diesel, Inc. ("Monte Machinery"). The core of Monte Machinery's business centered around petitioner's acquisition of a General Motors diesel engine dealership. In 1964 petitioner sold his interest in Monte Machinery to his two co-owners in order to pursue the acquisition of a Detroit Diesel Allison ("DDA") [8] distributorship [9] in Nevada. Petitioner failed to acquire this business and went back to work managing an eighteen-county operation for the Great Falls Terex dealer. Petitioner remained interested in acquiring a DDA distributorship and, in late 1965 or early 1966, he began negotiating for the purchase of the Phoenix distributorship with its then owner, Leonard Beck, Sr. *579 During approximately 18 months of negotiations with Beck, petitioner examined Beck's distributorship in detail, including conducting his own personal market survey to determine the acceptance of Detroit Diesel engines in the Arizona market. Petitioner found that Detroit Diesel had a five to fifteen percent market penetration for its products in Arizona. The two major competitors with Neils Detroit Diesel in Arizona were, and, at the time of the trial, continued to be, Empire Machinery Company (the Arizona Caterpillar dealer) and Cummins Arizona Diesel (the Arizona Cummins dealer). 9a Petitioner and Beck eventually agreed that petitioner would purchase Beck's distributorship. As a prerequisite to consummating the purchase, however, petitioner needed and eventually received the approval of the DDA general sales manager. *580 On February 24, 1967, Motors Holding Division ("MHD") [10] of General Motors Corporation executed an Offer to Loan nd Subscription to Stock Prior to Incorporation (the "Offer and Subscription") in which MHD agreed to loan money to and subscribe to the stock of Neils Detroit Diesel, Inc. (the "Corporation"), a corporation to be formed in Delaware to operate a diesel distributorship in Phoenix, Arizona. More specifically, MHD agreed to purchase 1,275 of the 1,475 authorized shares of $ 100 par value Class A voting stock and 850 of the 2,325 authorized shares of $ 100 par value Class B nonvoting stock. Further, MHD agreed to loan the Corporation $ 127,500. Under the terms of the Offer and Subscription, the Class A and Class B stock of the Corporation had the following rights and preferences: *581 The two classes of stock to share equally in dividends; losses to be borne equally up to 15% of the par values; thereafter, the losses to be borne by the Class B stock up to its full par value; Class A shares redeemable at book value at discretion of Board of Directors; each share of each class convertible at holder's election into any other class of stock, except that conversion into a class having any preference over the class of stock to be converted requires the prior written approval of the holders of a majority of each class having preference.
The Offer and Subscription further provided that in exchange for the loan of $ 127,500 the Corporation would issue to MHD its promissory note providing for annual principal payments from designated net earnings of the Corporation, with the unpaid balance of principal and interest due on demand after June 30, 1972. The offer and Subscription further provided: 5. It is a condition hereof that at all times while the undersigned is a holder of the note or Class A stock of said corporation its Board of Directors shall adopt and follow these policies: (a) While any principal of the note remains unpaid, the corporation will: (1) allocate *582 and pay in accordance with the terms of the note an amount equal to 45% of its net earnings available for dividends for each calendar year in satisfaction of the principal of the note before any redemptions of redeemable stock can be made or any dividends can be paid; and (2) allocate and pay $ 1 to redeem outstanding redeemable stock for each $ 1.20 declared and paid as cash dividends except that, whenever the number of shares of outstanding redeemable stock then held by the undersigned has been reduced to 20% of the total number of such shares theretofore purchased by undersigned, the $ 1 will instead be allocated and paid to further reduce the principal of the note; (b) When the note has been paid in full, $ 1 shall be allocated and paid to redeem outstanding redeemable stock for each $ 1 declared and paid as cash dividends until all such stock is redeemed; (c) Each time the principal of the note is reduced and/or redeemable stock is redeemed, an amount equal to the amount by which the principal of the note is reduced and/or an amount equal to the total par value of the stock redeemed shall be transferred to capital from surplus and such amount shall be designated capital *583 surplus and shall not be considered available surplus in declaring cash dividends. On February 28, 1967, R. G. Dickerson, J. A Kent and Z. A. Pool, III, incorporatedthe Corporation in Delaware. At their first meeting, the incorporators elected petitioner, D. L. O'Gorman [11] and Wayne D. Kuni [12] as directors of the Corporation. The incorporators also voted to accept the Offer and Subscription. The Corporation subsequently issued 1,275 shares of Class A stock, all of which were purchased by MHD for $ 127,500. The Corporation also borrowed $ 127,500 from MHD in exchange for which it issued to MHD its promissory note for that amount plus interest at 6 percent per annum. Contrary to the provisions of the Offer and Subscription and the minutes of the incorporators' first meeting, MHD did not purchase any Class B stock. Rather, the Corporation issued 850 shares of Class B stock, all of which were purchased by petitioner for $ 85,000. In June 1967, the Corporation *584 acquired Beck's distributorship. On June 6, 1967, as a part of the arrangement under which the Corporation acquired the distributorship, petitioner entered into a Distributor Selling Agreement and a Sales and Service Agreement with DDA. The Distributors Selling Agreement specifically provided that "[f]or the purposes of this Agreement the person or persons designated above shall be responsible for any act or omission of any of Distributor's agents or employees which may be contrary to the purposes and objectives of this Agrement or to any provision of this Agreement." Petitioner was the responsible party designated. On the same day, as an integral part of the financing plan with MHD, petitioner also entered into a Bonus Agreement with the Corporation and into an Option Agreement with MHD. Under the terms of the Bonus Agreement petitioner agreed to conduct the business and affairs of the Corporation in accord with policies established by its board of directors. In exchange, the Corporation agreed to pay petitioner as its president his salary plus "an annual bonus in an amount equal to one-third (1/3) of its annual 'earnings' in excess of 15 percent of its average month-end 'capital' *585 as hereinafter defined". The Bonus Agreement specifically defines the terms "earnings" and "capital" as follows: 4."Earnings" for the purposes of computing such bonus shall mean the net income of Dealer Company after provision for all taxes but before deducting such bonus but shall not include income derived from the sale or other disposal of assets in connection with a full or partial liquidation of Dealer Company. The accounting and reserve policies and procedures adopted from time to time by Dealer Company and in effect at the time such bonus is computed shall be used in determining said earnings. 5. "Capital" for the purpose of computing such bonus shall mean the sum of all of the following: a. The aggregate par values of Dealer Company's common shares outstanding; and b. The unpaid balance of the outstanding Long Term Indebtedness of the Dealer Company; and c. That portion of Dealer Company's Capital Surplus attributable to: (1) The retirement of "Long-Term Indebtedness" of Dealer Company. (2) The redemption and retirement of Dealer Company's common shares. (3) Any premium received on shares sold. "Long-Term Indebtedness" means any indebtedness to a *586 stockholder having a maturity at the time of its creation of more than 18 months, independent of acceleration. d. That portion of any stockholders' demand loans to Dealer Company and/or that portion of Dealer Company's Surplus which represents the net increase in the Company's common stock and/or "Long-Term Indebtedness" to be issued or created in accordance with reorganization of the company. The reason for calculating the bonus after reducing earning by 15 percent of the capital invested in the Corporation is that it has been MHD's experience that an operator with earnings equal to 15 percent of its invested capital is performing at average. Any additional earnings represent above average performance for which the operator should be given a bonus. The Option Agreement completed the financing package between petitioner and MHD. Under its terms, MHD gave petitioner the right to purchase its shares of stock under certain conditions. In exchange for this right, petitioner agreed to sell his stock to MHD under certain circumstances not here relevant, and to utilize his bonus and dividends paid on his stock as follows: Operator agrees that during the period of the option *587 granted him in Article 1: A. He will use all dividends received on his Stock and at least one-half of any bonus received by him from Dealer Company to purchase Investor's Stock; B. He will immediately convert any Class "A" Stock which he purchases from Investor into Class "B" Stock: C.The amount of the bonus he receives from Dealer Company which he desires to transmit to Investor for the purchase of Investor's Stock hereunder (which in no event will be less than 1/2 of the total amount of bonus he receives from Dealer Company) will be transmitted to Investor no later than five days after the receipt of such bonus by Operator. At the time petitioner began the operation of the Corporation in 1967, the Corporation consisted of approximately sixteen employees and a single plant of approximately 8,000 square feet which was leased from the former owner. By the end of calendar year 1977, the Corporation employed approximately 140 employees and owned two plants, in two different cities, together equaling approximately 48,000 square feet. During the years in issue, petitioner had both of these plants constructed, having personally approved the layout and design of each plant. *588 In 1967 or 1968, petitioner instituted a training program for his employees, dealers and customers. This program required the expenditure of approximately $ 135,000 for a laboratory, classroom facilities and faculty. The program was fully accredited by General Motors. Petitioner was personally involved in the development of the plans and the construction of these facilities. When petitioner acquired his distributorship, the inventory and accounting records were maintained manually by company employees. In 1971 or 1972, the Corporation switched to the use of computers. On behalf of the Corporation, petitioner arranged for the purchase of an IBM computer for approximately $ 185,000; had it installed, and arranged for the Corporation's employees to be trained on the new equipment. Petitioner arranged for feasibility studies to determine whether the Corporation's inventory could be computerized. After a careful reviewing of these studies, petitioner implemented such a procedure and, as a result of increased efficiency, the supply of inventory which had to be kept on hand to do the same volume of business was substantially reduced. Subsequently, the size of the original computer *589 was determined to be insufficient for the growing needs of the Corporation. The purchase of a new $ 250,000 IBM computer system was, therefore, authorized by petitioner. This purchase permitted a company employee at either plant to find out immediately whether a particular item was in stock. The organization of the Corporation provided for supervisors in the various departments. Supervisors acted in accordance with directives set down by petitioner. The department heads were authorized to make routine purchases, but special orders or large dollar items had to be authorized by Mr. Neils. Important corporate decisions were generally made by petitioner alone. The Corporation also established a great deal of foreign business. When the mining industry, from which the Corporation received many of its orders, went into a recession during the years 1974 through 1977, petitioner diversified as quickly as possible by seeking foreign business. Mr. Neils personally negotiated contracts with the Philippine Navy and with many foreign mining concerns located in Mexico, South America, India, the Philippines, and South Africa. Of the various products sold by the Corporation, only the *590 bare engines and transmissions were acquired from DDA. Electric generating plants, pumps, wind machines and other equipment offered to Neils Detroit Diesel customers were designed by the Corporation using the DDA diesel engines as the power source. During the first few years of the Corporation, petitioner helped design much of the equipment. In later years, a group of corporate employees together with petitioner designed new equipment to be offered by the Corporation. During the years in issue, the Corporation did from six to eight percent of its business with agricultural customers. Industrial customers provided 12 to 15 percent of the total corporate sales. The trucking industry contributed 30 to 35 percent of the Corporation's total revenues, and purchases by the mining industry provided 50 to 55 percent of all corporate sales or services. By the close of the 1971 calendar year, all Class A stock which had been held by MHD had been either purchased by petitioner or redeemed by the Corporation, and all outstanding loans to MHD had been paid.Pursuant to the provisions of the Corporation's Certificate of Incorporation, once the Class A stock had been redeemed and retired, *591 the Class B stock, all of which petitioner owned, automatically became the Corporation's voting stock. As the Corporation's sole shareholder, petitioner replaced the two MHD employees on the Corporation's board of directors with his wife and attorney once the Class A stock had been redeemed or retired. From its incorporation to the time of trial in this case, the Corporation made the following dividend payments: Date
Payee
Dividend
January 11, 1969
MHD
$ 5,913.41
Petitioner
3,942.28
January 14, 1970
MHD
19,575.43
Petitioner
14,790.32
During the entire time MHD had an investment in the Corporation, both petitioner and the corporation met their obligations under the various agreements composing the overall financing plan with MHD. After 1971, the Corporation continued in effect the Bonus Agreement with petitioner, without change. A summary of the information appearing on the Corporation's federal income tax returns is as follows: Gross
Tax
Receipts
Gross
Gross
Taxable
Year
(Sales)
Profit
Income
Income
1967
$ 799,241
$ 222,351
$ 223,879
($ 1,349)
1968
2,073,119
540,091
543,200
75,504 1969
3,358,155
904,867
911,189
215,782 1970
4,023,102
1,176,009
1,182,945
233,119 1971
4,761,646
1,427,123
1,441,936
254,294 1972
5,529,138
1,696,878
1,710,820
295,305 1973
7,240,242
2,229,865
2,252,169
428,389 1974
8,696,864
2,801,006
2,819,529
477,857 1975
10,180,107
2,697,108
2,737,629
450,613 1976
10,046,606
3,321,649
3,413,057
731,135 1977
12,244,919
3,305,407
3,348,099
190,718 *592 Tax
Net Income
Retained
Net
Year
After Taxes
Earnings
Assets
1967
($ 1,349)
($ 1,349)
$ 559,966
1968
46,053 26,761 883,579 1969
109,079 116,880 1,195,917 1970
125,087 128,339 1,771,193 1971
135,853 13,827 1,715,672 1972
156,230 170,057 2,043,352 1973
232,595 402,652 3,124,918 1974
255,194 657,846 3,301,650 1975
232,499 890,345 3,920,308 1976
390,677 1,281,022 4,690,780 1977
95,966 1,376,988 6,271,505
The Corporation maintained internal accounting records on the basis of accounting forms and procedures prescribed by General Motors and it used these forms in reporting the results of its operations to General Motors. A summary of that information is as follows: Net Before
Gross
Operating
Income Tax
Year
Sales
Profit
Profit
and Bonuses
1967
$ 799,241
$ 222,849
$ 12,087
$ (2,111)
1968
1,994,334
542,905
109,860
80,256 1969
3,358,155
908,162
316,508
280,846 1970
4,023,102
1,176,482
357,518
296,565 1971
4,649,667
1,439,667
409,051
345,827 1972
5,532,505
1,711,242
491,080
402,999 1973
7,234,072
2,258,207
792,203
615,408 1974
8,715,476
2,913,038
979,911
757,394 1975
10,249,302
2,922,591
1,092,314
890,548 1976
10,046,606
3,263,956
1,157,490
1,001,587 1977
12,244,919
4,031,511
1,385,705
* 1,150,388 *593 A summary of the total compensation accrued by the Corporation, and the cash amounts received by petitioner is as follows: Cash
Accrued
Contribution
Compensation
Tax
Operator's
to Profit-Sharing
Received by
Year
Salary
Bonus
Plan
Total
Petitioner
1967
$ 9,000
$ 9,000
$ 9,000
1968
16,750
16,750
16,750
1969
25,000
$ 30,892
52,892
25,000
1970
30,000
36,213
66,213
60,892
1971
30,206
46,760
76,966
67,419
1972
39,960
57,220
97,180
85,720
1973
39,960
99,862
139,822
97,180
1974
47,490
126,209
$ 3,127
176,826
147,352
1975
50,000
156,003
6,644
212,647
196,209
1976
50,000
184,318
5,002
239,320
186,002
1977
50,000
152,142
9,600
211,742
234,318
During 1974, the total compensation (salary plus bonus) paid to the Corporation's officers (other than petitioner), branch managers and department heads ranged from $ 5,200 to $ 26,600. The same figures for 1975 were $ 12,800 [13] to $ 29,000; for 1976 the figures were $ 10,297 [14] to $ 32,000; and for 1977 the figures were $ 16,379 [15] to $ 33,400. *594 On August 1, 1972, the Corporation borrowed $ 500,000 from Northwestern National Life Insurance Company ("North-western") under a Note Purchase Agreement. On February 15, 1974, the Corporation borrowed an additional $ 350,000 from Northwestern under a Note Purchase Agreement. Both of these loan agreements contained restrictions on the amount of salaries and bonuses the Corporation could pay. The agreements, together with several supplemental letter agreements, however, did permit the Corporation to pay petitioner his salary plus a bonus calculated under the existing Bonus Agreement. The total compensation (salaries, bonus, and profit-sharing plan) paid to or for Mr. Neils by Neils Detroit Diesel, Inc. in the years 1974 through 1977 were reasonable in amount, in view of the value of the services rendered by Mr. Neils. OPINION On November 15, 1979, respondent sent notices of deficiency to both petitioner and to Neils Detroit Diesel, Inc. In its notice of deficiency to Mr. and Mrs. Neils, respondent disallowed as earned income a portion of what was reported on petitioner's *595 tax return for "salary" and "bonus" payments paid during tax years 1974 and 1975. In the notices of deficiency of the same date sent to the Corporation, respondent determined that the deduction for compensation paid to petitioner was excessive for tax years 1974, 1975, 1976 and 1977. The sole issue for decision is whether during the years in question the salary, bonus and profit-sharing plan contributions for 1974 and 1975 paid by the Corporation to its president and sole stockholder constituted reasonable compensation. Respondent contends that the compensation paid by Neils Detroit Diesel during tax years 1974, 1975, 1976 and 1977 was excessive. Respondent believes that compensation during the years in issue in excess of $ 100,000, $ 100,000, $ 115,000 and $ 143,250, respectively, plus contributions to Mr. Neils' profit-sharing plan, was unreasonable and therefore not deductible under section 162(a)(1). Petitioners assert that the compensation paid Mr. Neils was reasonable considering the duties, expertise and responsibilities assumed by Mr. Neils, and his contributions to the success of the Corporation. After a careful review of the record and the briefs, we find petitioner's *596 total compensation for tax years 1974, 1975, 1976 and 1977 to be reasonable.
Whether amounts paid employees represent reasonable compensation for services rendered is a question of fact to be determined on the basis of the particular circumstances in each case. Huckins Tool and Die, Inc. v. Commissioner,289 F.2d 549 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. [16] Certain factors for consideration have repeatedly been cited by courts when faced with reasonable compensation cases. A comprehensive listing of many of the pertinent factors is found in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949).The United States Sixth Circuit Court of Appeals there stated: Although *597 every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of sales with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 712; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712, 715. *598 The situation must be considered as a whole with no single factor decisive. It should be noted that respondent's determination is presumed correct and petitioner has the burden of proving that he was entitled to a larger deduction. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Welch v. Helvering,290 U.S. 111 (1933); Tax Court Rules of Practice and Procedure, Rule 142(a). If petitioner succeeds in showing that respondent's determination is erroneous, the presumption of correctness associated with respondent's determination loses its effect and the Court must determine reasonable compensation from all the facts and circumstances presented in the particular case. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The issue of deductibility of salaries is not confined to an inquiry into the reasonableness of such payments.The fact that the payments *599 were reasonable is not dispositive of the issue; the payments must be for services rendered. Nor-Cal Adjusters, Inc. v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. [17] Therefore, the compensation paid to Mr. Neils must be both reasonable, and for services rendered before it can be deducted as an ordinary and necessary business expense. Treasury Regulation section 1.162-7(a). When a bonus is an integral part of a compensation arrangement between a corporation and one of its officers, the salaries and bonus must be considered as a whole when determining whether the compensation is reasonable. Compensation is reasonable *600 in only such amounts as would ordinarily be paid for like services by like enterprises under like circumstances. Clinton Co. v. Commissioner,159 F.2d 102, 104 (7th Cir. 1946). For a bonus to be considered compensation, it must be for services rendered and not a disguised distribution of earnings. Klamath Medical Service Bureau v. Commissioner,29 T.C. 339 (1957), affd. 261 F.2d 842 (9th Cir. 1958). [18]
In a similar fashion, when contributions are made by a corporation to an employee profit-sharing or annuity plan, these contributions should be considered as a part of the employee's compensation. Barton-Gillet Company v. Commissioner,442 F.2d 1343 (4th Cir. 1971), affg. a Memorandum Opinion of this Court. The corporate intent behind "compensation" payments presents a factual issue which must be resolved on the basis of all the facts and circumstances presented in each case. Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. *601 In the case now before the Court, Mr. Neils was not only the president of Neils Detroit Diesel, but also its sole stockholder. The facts must be carefully scrutinized when the corporate officer whose compensation is being questioned is also a major stockholder in the corporation. Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1156 (1980). [19] Under these circumstances, the agreements setting petitioner's salary and bonus must be examined. I The salary arrangement between petitioner and Neils Detroit Diesel was an integral part of the financing plan agreed to by Neils Detroit Diesel and MHD. It appears that MHD required the salary plus bonus arrangement in order to give an incentive to men of promising ability to undertake the operation of distributorships which they were expected to build up and eventually own. MHD furnished the original capital to the *602 fledgling distributorship, and received dividends until the new DDA distributorship obtained sufficient funds to purchase or redeem the stock held by MHD. At the time that petitioner and Neils Detroit Diesel entered into their salary arrangement, Mr. Neils owned no voting stock in the Corporation. In fact, two of the three original directors of the Corporation were MHD employees. There is no question that the original bonus agreement between Mr. Neils and Neils Detroit Diesel resulted from an arms-length transaction from which both Mr. Neils and the Corporation hoped to benefit. [20]
The fact that the original compensation arrangement with petitioner was entered into at arms-length, although significant, is not determinative of reasonableness. When the original *603 corporate resolution remains unchanged over a period of years, it may no longer be realistic. University Chevrolet Company, Inc. v. Commissioner,16 T.C. 1452 (1951), affd. 199 F.2d 629 (5th Cir. 1952). [21] In the instant case, the controlling agreement setting the amount of petitioner's bonus has not changed from the inception of the Corporation. Although all stock held by MHD had been retired or redeemed prior to the beginning of calendar year 1972, the Corporation continued in effect the original Bonus Agreement with Mr. Neils. Whether the original Bonus Agreement is realistic in light of the changed circumstances is a determination that must be made following a review of similar earnings by similar employees in similar companies. The two major competitors with Neils Detroit Diesel in Arizona *604 were Empire Machinery Company ("Empire") and Cummins ArizonaDiesel ("Cummins").A comparison of these three distributorships of diesel products reveals numerous substantive differences between these three "close" competitors. First, all three companies had different product lines. A majority of Empire's business consisted of selling and servicing already assembled pieces of Caterpillar equipment. Cummins, on the other hand, sold ThermoKing products, truck and trailer temperature control equipment as well as diesel engines. Neils Detroit Diesel sold diesel engines and transmissions, along with other products manufactured by the Corporation to utilize DDA products. Second, it is important to note that where Neils Detroit Diesel and Empire were basically one-man operations, the president of Cummins testified that his corporation operated under a management team concept. Finally, the record indicates that approximately 60 to 70 percent of the gross sales revenues generated by Neils Detroit Diesel during the years in issue resulted from providing parts and service for DDA engines and transmissions, and products utilizing these products. Respondent contends that petitioner's compensation *605 far exceeds the salaries and bonuses paid to either of the presidents of the Corporation's closest competitors. Admittedly, this appears to be true from the record. However, it is equally true that other DDA distributors were making far more than petitioner. Considering the difference in the DDA product line, compared to its competitors, [22] the service orientation of Neils Detroit Diesel, [23] and the impact of the MHD Bonus Agreement on petitioner's compensation, we conclude that contrary to respondent's contention, it is not as appropriate to compare petitioner's compensation to the salaries and bonuses paid by competitors to similar employees under different plans. Rather, it is more realistic to compare Mr. Neils' salary and bonuses to the compensation paid to other DDA distributors.
Three distributors of DDA products testified at trial. Mr. Williams, together with his partner Mr. *606 Lane, owned a DDA distributorship for many years in northern California. Mr. Abbott for approximately twenty years owned a DDA distributorship in Salt Lake City, Utah. Mr. Holeman owned a distributorship in Billings, Montana. All three distributors were compensated by their respective organizations for their services by a combined salary and bonus arrangement. The bonuses paid Williams, Abbott and Holeman were originally determined under an MHD Bonus Agreement identical to the one in the instant case. Although the salaries and bonuses of DDA distributors are determined according to the profitability of their individual franchises, the salaries and bonuses of other DDA distributors do reflect the kind of compensation that can be earned by similar employees in similar companies. At trial, Abbott testified that from 1975 through 1979, his basic salary "ran between" thirty and fifty thousand dollars a year.During this same period, Abbott stated that his annual bonus "ran between" $ 125,000 and $ 145,000. At trial, Williams testified that in 1977 his bonus alone was $ 195,000. [24] His combined salary and bonus for this year was $ 270,000. In 1978, Holeman received a bonus of *607 $ 176,000 and a salary of $ 53,000. In 1979, Holeman's bonus alone was $ 211,000.It can be concluded the bonuses paid to Abbott, Williams and Holeman are comparable to those paid to petitioner. Therefore, it cannot be said that the compensation paid to petitioner was unreasonable on its face. In connection with determining the overall reasonableness of petitioner's compensation in this case, we think it is significant to consider the degree to which comepensation was geared to performance. A key corporate employee, most of whose compensation is a large salary, *608 fixed under a non-renegotiable long-term contract which is not dependent on corporate profitability to any extent, and with a relatively small bonus or profit-sharing arrangement, does not have as much at risk as his counter-part whose fixed pay is low and who has to depend for most of his compensation upon his successful operation of the company.The latter employee has staked more of his livelihood on his industry, his skill, his judgment and, indeed, his good luck. It is not unreasonable to consider this element of risk-taking, in comparing the responsibleness of his compensation as opposed to his more conservative brother. Viewed from this aspect, we find that petitioner's overall compensation arrangements were decidedly of the higher risk-taking variety. As shown in our findings of fact, except for the Corporation's first two years (1967 and 1968) when no bonus was paid, and when petitioner's salary was rather nominal, the majority of petitioner's compensation through 1977 was derived from compensation which was contingent on the Corporation's profitability. In the years before the Court, petitioner's fixed salary never exceeded $ 50,000, a modest amount indeed for a chief *609 executive officer whose company was producing gross sales in the period of $ 8.7 million to $ 12.2 million, and gross profits of $ 2.9 million to $ 4.0 million. The part of petitioner's total compensation in these years which was not contingent upon his performance and the Corporation's performance ranged from a low of 21% to a high of 27%. Petitioner was gambling along with the Corporation, and his willingness to gear so much of his compensation to the Corporation's success and his own efforts is entitled to positive weight on the scales of reasonable compensation under section 162. II The fact that other DDA distributors are paid more than petitioner does not prove the reasonableness of his salary. It was the witness Holeman's conclusion that the rapid growth of his DDA distributorship was due to the competitive price and superior design of DDA products. It has long been held that an increase in compensation to a corporate officer due to a fortuitous market with no commensurate increase in the duties of the employee is a factor that suggests unreasonableness. Adams Tooling, Inc.v. Commissioner,33 T.C. 65 (1959), *610 affd. 289 F.2d 554 (7th Cir. 1961). [25] An examination of petitioner's duties and performance is therefore required. There can be no dispute that from the inception of Neils Detroit Diesel, petitioner was the driving force behind the Corporation. Mr. Neils had approximately twenty years of experience at the time he received his DDA distributorship in 1967. Petitioner had extensive experience in all aspects of the heavy construction equipment and supplies industry. As early as 1959, petitioner was operating his own diesel engine dealership under the name of Monte Machinery GM Diesel, Inc. Not satisfied with this, petitioner sold his interest in the business in 1964, and set out to acquire a DDA distributorship. In 1967, Mr. Neils opened Neils Detroit Diesel with $ 85,000 of his own funds and $ 127,500 loaned to the Corporation by MHD. Under the financing package entered into between the Corporation and *611 MHD, petitioner was personally responsible for the total management of Neils Detroit Diesel.Petitioner's aggressive leadership resulted in the purchase or the redemption of all voting stock held by MHD within a four-year period. [26] At the time that Neils Detroit Diesel was incorporated, the Corporation had approximately 16 employees and a single plant of approximately 8,000 square feet. In 1977, Neils Detroit Diesel employed approximately 140 employees and had two plants together equaling approximately 48,000 square feet. During this same ten-year period, the gross sales grew from $ 799,241 in 1967, to $ 12,244,919 in 1977. There is no question that the gamble taken by Mr. Neils when he sold his interest in Monte Machinery had paid off. Mr. Neils was the principal actor on the Corporation's stage. All important corporate decisions rested with him. The department heads were authorized to make routine purchases, but special orders or large dollar items had to be authorized by Mr. Neils. Petitioner was generally involved in the sales negotiations with customers. When the mining industry, *612 from which the Corporation received many of its orders, went into a recession during the years 1974 through 1977, petitioner diversified the Corporation as quickly as possible by seeking foreign business. Mr. Neils personally negotiated contracts with the Philippine Navy and with many foreign mining concerns located in Mexico, India, South Africa, the Philippines, and South America. During the first ten years of Neils Detroit Diesel, petitioner negotiated and, on occasion, guaranteed loans made to the Corporation. Petitioner not only expanded his operation, but personally decided the layout and design of both the Phoenix and Tucson facilities. A training program was set up at petitioner's direction in 1967, for employees, dealers and customers. Petitioner helped design many of the pieces of machinery built by the Corporation to utilize Detroit Diesel engines and Allison transmissions. Petitioner negotiated union contracts for the Corporation's mechanics and parts people. During this period Mr. Neils arranged for the purchase of two computer systems for the Corporation. These purchases, totalling approximately $ 430,000, reduced required inventory, kept the Corporation's financial *613 records, and were intended to generate a 20% return on investment. Under these circumstances, it would be very hard to down-play the scope or the importance of the contributions made by Mr. Neils to the success of the Corporation. Petitioner's diligence and devotion to the Corporation resulted in gains for the Corporation which are impressive when the profits of Neils Detroit Diesel are compared to other DDA distributorships across the nation. In relation to its sales, the Corporation's net profit after petitioner's compensation was 69.5% greater than the average DDA distributor in 1974. In 1975, 1976, and 1977, the net profits of Neils Detroit Diesel were greater than the average distributor by 30.6%, 66.5% and 14%, respectively. [27]
*614 During the years in issue, petitioner's total compensation varied according to the success of the Corporation. The ratio of petitioner's Compensation accrued by the Corporation, expressed as a percent of the Corporation's net income, before petitioner's compensation and before income tax, varied over the first decade of operation from a high of 22.65% in 1976, to a low of 17.26% in 1968. [28] It is more revealing, however, that petitioner's compensation averaged 20.84% over the ten-year period starting in calendar year 1968. The fact that the ratio of owner compensation to the net income of Neils Detroit Diesel was consistently within a few percentage points of prior years gives rise to an inference that petitioner's compensation was reasonable. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949); Clinton Co. v. Commissioner,159 F.2d 102, 104 (7th Cir. 1946). When all these factors are considered there is little question that petitioner's compensation was reasonable in light of the circumstances. It cannot be concluded that the success *615 of Neils Detroit Diesel was solely attributable to fortuitous market conditions. III Earlier, it was indicated that for compensation to be deductible under section 162(a)(1), the salaries paid to corporate officers must be both reasonable and for services rendered. An examination of the dividend history of the Corporation is essential if it is to be determined whether the compensation paid to petitioner was truly for services rendered or a disguised distribution of corporate earnings. The record before *616 us indicates that over the life of the Corporation, Neils Detroit Diesel had paid a total of $ 44,221.44 in dividends. These dividends were paid during 1969 and 1970 to both MHD and Mr. Neils pursuant to the original financing plan under which the Corporation got its start. It is to be noted that since the close of calendar year 1971 when petitioner became the Corporation's sole stockholder no dividends have been issued. An inference can be made that some reported compensation is a disguised distribution of profits if no dividends are issued. CharlesSchneider & Co., Inc. v. Commissioner,500 F.2d 148, 153 (8th Cir. 1974). [29]
The litmus test for determining whether the nonpayment of dividends is indicative of a disguised distribution of earnings *617 is whether a substantial shareholder, who is not actively engaged in the business, is willing to forgo the payment of dividends while a significant portion of the Corporation's income is paid out as salaries or bonuses. Charles McCandless Tile Service v. United States,191 Ct. Cl. 108, 422 F.2d 1336 (1970). There is no question that a businessman would not long pursue an endeavor if there was no return on his investment. Nor-Cal Adjusters v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. Memorandum Opinion of this Court. The facts must be heavily scrutinized when the officer whose compensation is questioned is also a major stockholder. [30]
In the case before us, the absence of dividends does not conclusively prove that the compensation paid to an employee-stockholder is unreasonable. As the Seventh Circuit Court of Appeals said in Edwin's, Inc.:
While the absence of dividends might be a red flag, it should not deprive compensation demonstrated to be reasonable under all the circumstances of the status of *618 reasonableness. [31]
Dividends do not have to be paid if there is sufficient reason not to. Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 714 (1977). In the instant case, there appears to be good reason for the lack of substantial dividend payments over the first ten years of the corporation. During the first decade of operation, Neils Detroit Diesel expanded constantly both in size and in the services that it offered its customers. Inventories from the beginning of 1974 to the end of 1977 had grown from $ 1,384,153 to $ 3,695,181. In the same period, buildings and other fixed depreciable assets (before depreciation) grew from $ 1,007,447 to $ 1,838,390. Management procedures were refined constantly under petitioner's leadership, requiring the expenditures of large sums of money for both training facilities and computer systems. Finally, the record indicates that the Corporation was constantly *619 designing everything from portable generators to wind machines in order to capitalize on the superior quality of Detroit Diesel engines and Allison transmissions. All of these developments resulted in the need for large amounts of capital, as shown by the fact that the Corporation had to borrow $ 500,000 in 1972, and a further $ 350,000 in 1974, from the Northwestern National Life Insurance Company, each on a fifteen-year basis. It is our conclusion that there was adequate reason for the Corporation not to pay dividends during this period. Levenson & Klein, Inc. v.Commissioner,67 T.C. 694, 714 (1977); see Good Chevrolet v.Commissioner,T.C. Memo 1977-291. We conclude that petitioner's total compensation for 1974, 1975, 1976 and 1977 was reasonable and for services rendered. Therefore, Neils Detroit Diesel is entitled to deduct the salary and bonus accruals for these years from its corporate tax returns as ordinary and necessary business expenses under section 162(a). As agreed by the parties, it further follows that the contributions by Neils Detroit Diesel, Inc. to its profitsharing olan in 1974 and 1975 are deductible by the Corporation *620 to the extent allowable under section 404. It also follows that petitioners in Docket 5801-79 may treat their salary and bonus received for the year 1975 as personal service income in computing their tax under the provisions of section 1348. To give effect to the above, Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated for purposes of trial, briefing and opinion: William C. and Betty L. Neils, Docket No. 5801-79 and Neils Detroit Diesel, Inc., Docket Nos. 5802-79 and 17552-79.↩
*. This case was tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge dated February 1, 1982, the case was reassigned to Judge Jules G. Korner III↩.
2. The parties have agreed that the one additional issue not settled prior to litigation, the disallowance of the Corporation's deductions for contributions made to its profit sharing plan, will be controlled by the Court's decision on the issue of reasonable compensation, and will be adjusted accordingly. Likewise, petitioners in Docket 5801-79 have conceded on brief that the issue raised by them in their petition, regarding the computation of the maximum tax on earned income under section 1348 for 1975, will also be governed by our disposition of the reasonable compensation issue in the other two dockets. All statutory references are to the provisions in the Internal Revenue Code of 1954 in effect during the years in issue.↩
3. One of the stipulated facts (Stipulation No. 9), stating that MHD bought 1,275 shares of Class A stock but no Class B stock, is contradicted by documentary evidence. (Exhibits 7-G and 8-H). After a careful review the Court notes this discrepancy, but since the parties have agreed to proceed on this basis, the Court chooses to adopt Stipulation No. 9 as a finding of fact.↩
4. Betty L. Neils is a petitioner solely by virtue of having filed joint returns with her husband.↩
5. Caterpillar produces heavy construction equipment, some agricultural equipment, and other related products. Caterpillar was the pioneer in the manufacture of crawler type tractors. ↩
6. A Caterpillar dealer is responsible for selling, servicing and supplying parts for construction equipment built by Caterpillar.↩
7. Terex is the trade name for General Motors Construction Equipment Division ("GMCED"), a direct competitor of Caterpillar. GMCED, like Caterpillar, builds primarily heavy construction equipment used in constructing highways, dams, or other projects.↩
8. Detroit Diesel Allison Division of General Motors Corporation ("DDA") is engaged in the manufacture and sale of diesel engines and transmissions of various sizes for use in various forms of machinery. Engines are sold under the name of "Detroit Diesel" and transmissions are sold under the name "Allison". DDA does not sell the heavy equipment in which its engines and transmissions are used. In the vernacular of the industry, DDA only sells a basic engine from "fan to flywheel". ↩
9. DDA distributes its products through its distributors and their dealers. DDA sells its products to its distributors who are assigned geographical areas of responsibility. Each distributor sets up dealers within that area, serves as a factory warehouse for those dealers, provides administration, training, parts and service support, and other assistance to his dealers.↩
9a. Empire Machinery Company (the Arizona Caterpillar dealer) sells a complete line of Caterpillar machines and equipment, with the sale of diesel engines accounting for only 15 to 20 percent of total sales. Cummings Arizona Diesel, Inc. sells diesel engines, ThermoKing products, and truck and trailer temperature control equipment in the State of Arizona.↩
10. In 1929, GM initiated the Motors Holding Plan (the predecessor to MHD) in response to a perceived need to assist in the development of quality GM dealers. Basically, MHD is designed to assist in the purchase of a new or existing dealership by supplementing the purchaser's capital resources. MHD also helps finance the buy out of inactive partners by active partners in a dealership, and it provides some financing for the expansion and modernization of an existing dealership. Since its inception, MHD has assisted in financing approximately 2.900 GM dealers.↩
11. D. L. O'Gorman was a branch manager for MHD working out of Denver, Colorado. ↩
12. Wayne D. Kuni was O'Gorman's boss working out of Houston, Texas. Kuni was in charge of the western United States for MHD.↩
*. Reduced by journal entry to $ 875,308 before bonus calculation.↩
13. This figure excludes persons who worked only a portion of the year. ↩
14. Id.↩
15. Id.↩
16. SeeNor-Cal Adjusters, v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Company of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Kennedy v. Commissioner,72 T.C. 793↩ (1979).
17. SeeKennedy v. Commissioner,72 T.C. 793, 801 (1979); Charles McCandless Tile Service v. United States,191 Ct. Cl. 108, 422 F.2d 1336 (1970); Irby Construction Company v. United States,154 Ct. Cl. 342, 290 F.2d 824 (1961); Commissioner v. R.J. Reynolds Tobacco Company,260 F.2d 9, 13↩ (4th Cir. 1958).
18. SeeHuckins Tool and Die, Inc. v. Commissioner,289 F.2d 549↩ (7th Cir. 1961).
19. SeeDialectric Material Company v. Commissioner,57 T.C. 587, 591 (1972); Northlich, Stolley, Inc. v. United States,177 Ct. Cl. 435, 443, 368 F.2d 272 (1966); LoganLumber Co. v. Commissioner,365 F.2d 846↩ (5th Cir. 1966).
20. SeeUniversity Chevrolet Co., Inc. v. Commissioner,16 T.C. 1452 (1952), affd. 199 F.2d 629 (5th Cir. 1952); Clinton Co. v. Commissioner,159 F.2d 102 (7th Cir. 1946), affg. Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 568 (1974), affd. 528 F.2d 176↩ (10th Cir. 1975).
21. SeeGood Chevrolet v. Commissioner,T.C. Memo 1977-291; Adams Tooling, Inc. v. Commissioner,33 T.C. 65, 74 (1959), affd. 289 F.2d 554 (7th Cir. 1961); Hammond Lead Products,Inc. v. Commissioner,425 F.2d 31, 33↩ (7th Cir. 1970), affg. Memorandum Opinion of this Court.
22. As noted in our findings, DDA sold only engines and transmissions. This required petitioner to do more independent design on machines to receive these engines than a distributor for Caterpillar. ↩
23. The accountant, Mr. Morgan, for Neils Detroit Diesel testified to this fact at trial.↩
24. Mr. Williams indicated that he modified his bonus agreement in 1967 in order to simplify the calculation needed to arrive at his yearly bonus. This amendment to his bonus agreement was not, however, intended to reduce the amount of the yearly bonus, but rather to approximate the MHD bonus calculation without the use of the MHD formula. In 1973, Mr. Williams agreed to share his bonus with another corporate officer, Mr. Piggott, after the death of his partner, Mr. Lane.Again, his shared bonus with Mr. Piggott was intended to approximate the total bonus that would have been paid under the standard MHD bonus agreement.↩
25. In Accord:Ernest Holdeman & Collet, Inc. v.Commissioner,290 F.2d 3, 7 (7th Cir. 1961), affg. a Memorandum Opinion of this Court; Pacific Grains, Inc.v. Commissioner,399 F.2d 603, 607↩ (9th Cir. 1968).
26. In 1971, petitioner refinanced the whole Corporation in order to buy out MHD.↩
27. Exhibit 43, as revised for calendar year 1977 pursuant to Stipulation 25, is the source of these figures. When the Corporation's profits for each of the years in issue is compared to the average profits nationwide for DDA distributors, the extraordinary success of Neils Detroit Diesel becomes apparent. The table below demonstrates the profitability of petitioner's Corporation in comparison to other distributors. (Figures shown represent percentages of net sales.) 1974
1975
Neils
Nat. Av.
Neils
Nat. Av.
Gross Profit
33.42
25.51
28.51
27.76
Operating
Profit
11.24
7.54
10.66
8.53
Net Profit
3.90
2.30
3.88
2.97
↩
1976
1977
Neils
Nat. Av.
Neils
Nat Av.
Gross Profit
32.49
27.35
30.68
26.95
Operating
Profit
11.53
7.36
9.07
7.16
Net Profit
4.23
2.54
2.31
2.02
28. Ratio of Petitioner's Compensation Expressed As a Percentage of Neils Detroit Diesel's Net Income
Net Income Before Income
Tax, Salary, Profit Sharing
or Bonuses *
Compensation *
Percentage
1968
$ 97,006
$ 16,750
17.26%
1969
305,846
52,892
17.93%
1970
326,565
66,213
20.27%
1971
376,033
76,966
20.46%
1972
442,959
97,180
21.93%
1973
665,368
139,822
21.01%
1974
808,011
176,826
21.88%
1975
947,192
212,647
22.45%
1976
1,056,589
239,320
22.65%
1977
934,908
211,742
22.64%
* Source: Stipulations in record.↩
29. Griffin & Co. v. United States,182 Ct. Cl. 436, 389 F.2d 802, 810 (1968); Adams Tooling, Inc. v. Commissioner,289 F.2d 554, 556 (7th Cir. 1961); Wag-Aero, Inc. v. United States, an unreported case ( E.D. Wis. 1980, 47 AFTR 2d 81-762, 81-1 U.S.T.C. P9183↩).
30. See note 19, supra.↩
31. Edwins, Inc. v. United States,501 F.2d 675, 677 n. 5 (7th Cir. 1974); Clinton Co. v. United States,159 F.2d 102, 104 (7th Cir. 1946); Levenson & Klein, Inc. v.Commissioner,67 T.C. 694, 714↩ (1977).